2003-NMSC-005

61 P.3d 806

**RIO GRANDE CHAPTER OF THE SIERRA CLUB, Plaintiff–Petitioner,**

v.

**NEW MEXICO MINING COMMISSION, Defendant–Respondent,**

and

**New Mexico Energy, Minerals, and Natural Resources Department, Mining and Minerals Division, and Copar Pumice Co., Inc., Intervenors–Respondents.**

No. 26,904.

Supreme Court of New Mexico.

Dec. 20, 2002.

Rehearing Denied Jan. 7, 2003.

Douglas W. Wolf, Douglas Meiklejohn, New Mexico Environmental Law Center, Santa Fe, NM, for Petitioner, Rio Grande Chapter of the Sierra Club.

Patricia Madrid, Attorney General, Patrick T. Simpson, Assistant Attorney General, Santa Fe, NM, for Respondent, New Mexico Mining Commission.

Ted Apodaca, Special Assistant Attorney General, for Intervenor–Respondent, New Mexico Energy, Minerals, and Natural Resources Department, Mining and Minerals Division.

Louis W. Rose, Carolyn A. Wolf, Montgomery & Andrews, P.A., Santa Fe, NM, for Intervenor–Respondent, Copar Pumice Co., Inc.

## OPINION

KENNEDY, Justice.

{1} Petitioner, Rio Grande Chapter of the Sierra Club (Sierra Club), appeals from the decision in *Rio Grande Chapter of the Sierra Club v. New Mexico Mining Commission*, 2001–NMCA–047, ¶ 29, 130 N.M. 497, 27 P.3d 984, in which the Court of Appeals reversed the district court's decision to set aside a final order of the New Mexico Mining Commission (Commission) affirming the issuance of a revised mining permit under the New Mexico Mining Act, NMSA 1978, §§ 69–36–1 to –20 (1993, prior to 2001 amendment). Specifically, the Commission's order affirmed the decision of the Director of the New Mexico Energy, Minerals and Natural Resources Department, Mining and Minerals Division (MMD) to expand the permit area for the Las Conchas Mine, operated by Copar Pumice Co., Inc. (Copar), to include El Cajete Mine, also operated by Copar, as a "new mining unit" of an "existing mining operation," rather than requiring Copar to obtain a separate permit for El Cajete Mine as a

"new mining operation." On appeal, Sierra Club asserts that: (1) the Commission's order is arbitrary, capricious, and contrary to law; and, (2) the Mining Act does not authorize the expansion of a permit area, once that area is fixed in a mining operation permit. We affirm the Court of Appeals.

## FACTS AND PROCEDURAL BACKGROUND

{2} On May 4, 1998, Sierra Club petitioned the Commission to review the Director's decision pursuant to NMSA 1978, § 69–36–15(A) (1993). In those proceedings, Sierra Club argued that the Director acted contrary to the Mining Act by expanding the permit area for the Las Conchas Mine (Las Conchas) and then modifying the permit to include the proposed El Cajete Mine (El Cajete) as a new mining unit within the enlarged permit area. *See* NMSA 1978, § 69–36–7(D) (1997). Sierra Club claimed that El Cajete should have been subject to the more rigorous environmental safeguards applicable to a new mining operation under the Mining Act. *See* NMSA 1978, § 69–36–12(A) (1993). The parties stipulated to the following facts before the Commission.

{3} On November 18, 1987, Copar filed a plan of operation with the United States Department of Agriculture's Forest Service ("Forest Service") to operate a thirty-three acre open-pit block pumice mine (Las Conchas) in the Santa Fe National Forest. The plan of operation, with modifications to mitigate potential environmental impacts from the mining operation, was approved by the District Ranger on January 4, 1989. Las Conchas was permitted by the Forest Service at thirty-three acres. Copar began operations at Las Conchas in 1989.

{4} On July 24, 1992, Copar filed a plan of operation with the Forest Service for the proposed El Cajete open-pit pumice mine. As proposed, El Cajete encompassed 133 acres. Prior to the Forest Service's decision, Copar agreed to reduce the size of the proposed mine to 83.5 acres, to address some of the concerns raised during early Forest Service analysis. El Cajete was permitted by the Forest Service at 76.2 acres.[1] Copar considered El Cajete as an expansion of its operation at Las Conchas.[2] Copar proposed El Cajete to expand its source of pumice.

{5} On June 30, 1994, Copar submitted a combined site assessment under the Mining Act for Las Conchas and El Cajete. *See* NMSA 1978, § 69–36–5 (1993).[3] The assessment stated that El Cajete was a logical expansion of Las Conchas and it should be considered as an existing mine under the Mining Act. As part of the site assessment, Copar proposed a permit area that included both Las Conchas and El Cajete.

{6} MMD Acting Director John Lingo advised Copar by a letter dated July 27, 1994, that El Cajete did not then qualify as an existing mine site, but could be brought in as a revision, or new unit of an existing site, later in the permitting process. He also

1. MMD Director Kathleen Garland testified before the Commission that MMD had substantial baseline environmental data regarding El Cajete Mine in the form of an Environmental Impact Statement (EIS) prepared by the Forest Service.

2. Las Conchas and El Cajete are located in the same geologic formation. The boundaries as approved by the Forest Service for Las Conchas and El Cajete are 1.1 miles apart at their closest. The access to the Las Conchas from State Highway 4 is via a 400 foot access road. Access to El Cajete from State Highway 4 is via Forest Service Roads 131 and 4G.

3. Section 69–36–5(B) provides that:

The mining operation site assessment shall include:
(1) identification of a proposed permit area for the mining operation;

(2) a description of the location and quality of surface and ground water at or adjacent to the mining operation and an analysis of the mining operation's impact on that surface and ground water;
(3) a description of the geologic regime beneath and adjacent to the mining operation;
(4) a description of the piles and other accumulations of water, tailings and other materials and an analysis of their impact on the hydrologic balance, drainages and air quality;
(5) an analysis of the mining operation's impact on local communities;
(6) a description of wildlife and wildlife habitat at and surrounding the mining operation and an analysis of the mining operation's impact on that wildlife and wildlife habitat; and
(7) for existing mining operations, a description of the design limits for each unit, including waste units, impoundments and stockpiles and leach piles.

stated that the only other alternative would be to permit El Cajete as a completely separate and new mine site. On or about November 30, 1995, Copar requested an extension for submitting the Las Conchas/El Cajete Permit Application and Closeout Plan. Copar also asserted that El Cajete should be included in the permit application as part of the existing mining operations.

{7} On or about December 18, 1995, MMD Director Garland approved the requested extension for submitting the closeout plan for the "Las Conchas/El Cajete existing mine permit application...." By letter dated March 14, 1996, Director Garland indicated MMD had not made a decision regarding the treatment of El Cajete. The letter stated that MMD would accept a permit boundary for the Las Conchas site alone. She further advised Copar that if MMD concluded El Cajete was not a new mine, it could be brought into the Las Conchas permit at a later date. Copar questioned MMD's request that Copar exclude El Cajete from its permit application.[4]

{8} On May 15, 1996, Copar provided MMD with a permit boundary map including only Las Conchas. Copar reserved the right to appeal MMD's decision to separate El Cajete from the proposed permit boundary. On October 16, 1996, Copar filed with MMD a request to revise the permit for Las Conchas to include El Cajete within the proposed revised permit area. The permit revision package noted that the El Cajete new unit is a logical expansion of Las Conchas. In a letter dated January 31, 1997, MMD stated that the permit application of Las Conchas would be amended to include the El Cajete revision.

{9} On August 23, 1997, MMD held a public hearing for both the Las Conchas permit and revision to include El Cajete as a

new unit. In October, Copar wrote to MMD and again asserted that El Cajete should be permitted as an existing unit to an existing mine. On October 23, 1997, MMD issued the permit for the Las Conchas. On March 4, 1998, MMD issued the Las Conchas permit revision to include El Cajete as a new unit.[5] Copar began mining at El Cajete in March 1998, and continues to do so to date.

{10} After a hearing on Sierra Club's petition, the Commission entered a final order on September 28, 1998, adopting the parties' stipulated facts as its own findings and affirming the Director's decision. In the order, the Commission set forth a number of legal conclusions based on its interpretation of the Mining Act and the Mining Act Rules [6] in support of its ultimate conclusion that El Cajete was properly permitted as a new mining unit of Las Conchas rather than as a separate new mining operation. Sierra Club filed an appeal with the district court, which set aside the Commission's order as contrary to law and ordered the Commission to vacate the Las Conchas permit revision. Copar, MMD, and the Commission appealed to the Court of Appeals, which reversed the district court and reinstated the Commission's order.

## DISCUSSION

### A. Standard of Review

{11} The parties devote a substantial portion of their briefs discussing the standard of review that we should apply. Initially, Sierra Club, in reliance on *Atlixco Coalition v. Maggiore*, 1998–NMCA–134, ¶ 23, 125 N.M. 786, 965 P.2d 370, argues that we must limit our review of the Commission's final order to determine whether the legal grounds specifically stated in the order are sufficient to sustain its ultimate conclusion. In *Atlixco*, the Court of Appeals stated that a "reviewing court 'may not supply a reasoned

---

4. Director Garland explained that MMD was concerned about reclamation already underway at Las Conchas, for which it wanted a strong closeout plan and permit, before finalizing a permit that included El Cajete.

5. The record demonstrates that the Director's decision to permit El Cajete as a new mining unit reflected a compromise between Copar's assertion that El Cajete was simply an existing unit of Las Conchas, and as such should only be subject

to the lowest level of environmental safeguards applicable to an existing mining operation, and the possibility that El Cajete should be permitted as a new mining operation.

6. During the pendency of the proceedings below, the Rules were renumbered as 19.10 NMAC, Parts 19.10.1 through 19.10.14, and were slightly reorganized. In this opinion, we cite to the present version of the Rules.

basis for the agency's action that the agency itself has not given.' " *Id.* ¶ 20 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). This rule originates with United States Supreme Court case law. For example, the Court explained in *S.E.C. v. Chenery* that:

[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside for the administrative agency.

*Id.* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *see Atlixco*, 1998–NMCA–134, ¶ 20, 125 N.M. 786, 965 P.2d 370 ("[f]or the court to supply reasons for the [agency] in this manner is not consistent with the doctrine of separation of powers because it 'foists upon the court what is essentially a function of the Executive Branch of government.' ") (quoting *McGonigel's, Inc. v. Pa. Liquor Control Bd.*, 663 A.2d 890, 893 (Pa. Commw.Ct.1995)); *see also Tenneco Oil Co. v. New Mexico Water Quality Control Comm'n*, 107 N.M. 469, 474, 760 P.2d 161, 166 (Ct.App.1987) (stating that courts are not free to accept *post hoc* rationalizations of counsel in support of agency decisions, because a reviewing court must judge propriety of agency action solely on grounds invoked by agency).

█ {12} Sierra Club reads this line of cases too broadly. "Normally an agency rule would be arbitrary or capricious if the agency ... failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). These are the deficiencies for which court should not attempt to "supply a reasoned basis." *Id.* (quoting *Chenery*, 332 U.S. at 196, 67 S.Ct. 1575).

█ {13} On the other hand, a court may " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Moreover, " 'it is the function of the courts to interpret the law,' and courts are in no way bound by the agency's legal interpretation." *Chavez v. Mountain States Constructors*, 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971 (1996) (quoting *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995)); *see Oil Transp. Co. v. N.M. State Corp. Comm'n*, 110 N.M. 568, 570, 798 P.2d 169, 171 (1990) ("On appeal we may correct an administrative agency's misapplication of the law."). Because we believe that a court may substitute its own interpretation of the applicable law for that of the Commission, we disagree with Sierra Club's characterization of our review function.

█ {14} However, that does not end the inquiry. MMD claims that our review does not encompass the level of review utilized by the district court below, which is whether the Commission's order was: "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." NMSA 1978, § 69–36–16(F) (prior to 1999 amendment).[7] MMD relies on *State v.*

---

7. Under the amendment to Section 69–36–16 the appeal of an administrative order under the Mining Act is governed by NMSA 1978, Section 39–3–1.1 (1998). Section 39–3–1.1 provides that the standard of review to be applied by the district court is whether:

(1) the agency acted fraudulently, arbitrarily or capriciously;

(2) the final decision was not supported by substantial evidence; or
(3) the agency did not act in accordance with law.

Section 39–3–1.1(D). This standard differs from that previously set forth in Section 69–36–16, in that it does not include review for abuse of discretion. However, Section 69–36–16 governed the appeal of this matter to district court,

*Conn,* 115 N.M. 99, 847 P.2d 744 (1993), and *C.F.T. Development, LLC v. Board of County Commissioners,* 2001–NMCA–069, 130 N.M. 775, 32 P.3d 784. In *Conn,* the State petitioned this Court for a writ of certiorari, asking us to review a determination by the Court of Appeals that the trial court abused its discretion in admitting evidence of the defendant's prior conviction for assault. *Id.* at 99, 847 P.2d at 744. We quashed the writ of certiorari as improvidently granted, because none of the four bases upon which we may grant certiorari was present. *Id.* at 100–01, 847 P.2d at 745–46 (holding that Court of Appeals decision below did not conflict with its earlier decisions or those of this Court; nor did the issue presented "involve a significant question of constitutional law or of substantial public interest.") (citing NMSA 1978, § 34–5–14(B) (1972)); *see* Rule 12–502(C)(4) NMRA 2002. In *Conn,* we merely held that the particular issue that we were faced with did not rise to the necessary level of importance, as determined by Rule 12–502, for us to grant a writ of certiorari. *Id. Conn* does not stand for the proposition that we will never review an administrative order under an administrative standard of review.

{15} The Court of Appeals relied on *Conn* in *C.F.T.,* where the court stated that "[m]atters of abuse of discretion were solely for the initial appellate court to review." *C.F.T.,* 2001–NMCA–069, ¶ 10, 130 N.M. 775, 32 P.3d 784. Thus, the Court of Appeals, interpreting its own powers of certiorari review of a district court's decision in an administrative appeal under NMSA 1978, § 39–3–1.1 (1999) and Rule 12–505–NMRA 2001,[8] held that, as a general rule, it would no longer review final agency decisions under an administrative standard of review. *C.F.T.,* 2001–NMCA–069, ¶¶ 12–14, 130 N.M. 775, 32 P.3d 784. The court reasoned that "Rule 12–505 limits

both the grounds on which we will issue a writ of certiorari and the review we will thereafter conduct of a district court decision in an administrative appeal." *Id.* ¶ 11. The court's analysis in *C.F.T. Development* construes our holding in *Conn* too broadly.

{16} This Court has stated since *Conn* that we will conduct the same review of an administrative order as the district court sitting in its appellate capacity, while at the same time determining whether the district court erred in the first appeal. *Rex, Inc. v. Manufactured Hous. Comm.,* 119 N.M. 500, 504, 892 P.2d 947, 951 (1995); *Rauscher, Pierce, Refsnes, Inc. v. Taxation and Revenue Dep't,* 2002–NMSC–013, ¶¶ 1 & 9, 132 N.M. 226, 46 P.3d 687 (applying an administrative standard of review under NMSA 1978, § 7–1–25(C), in a case in which we granted certiorari under Rule 12–502). The critical issue under Rules 12–502 and 12–505 is whether the case presents issues of significant importance to justify the granting of a writ of certiorari, and that determination is not dependent on the standard of review applied by the court below, nor does it limit the standard of review that this Court or the Court of Appeals may apply on appeal.[9] Of course, the court in *C.F.T.* may have recognized this distinction by stating that, "[w]hile in theory, arbitrary conduct, abuse of discretion, or lack of substantial evidence might be inextricably integrated into an issue of substantial public interest and justify our review on that ground . . . ." *C.F.T.,* 2001–NMCA–069, ¶ 12, 130 N.M. 775, 32 P.3d 784. But to the extent that *C.F.T.* and its progeny [10] state that the Court of Appeals, and by implication this Court, may not apply an administrative standard of review to a district court's decision regarding an administrative order, those cases are hereby overruled.

which was filed before the effective date of the amendment.

8. Rule 12–505 provides four bases on which the Court of Appeals may grant a writ of certiorari to review the district court's decision with regard to an administrative agency decision. These bases are virtually indistinguishable from the grounds set forth in Rule 12–502 with regard to a writ of certiorari for review by this Court.

9. We note that we granted certiorari in this matter, because our determination of whether MMD

may expand a mining permit area under the Mining Act presents a matter of substantial public interest.

10. *See BC & L Pavement Servs., Inc. v. Higgins,* 2002–NMCA–087, ¶¶ 2–3, 132 N.M. 490, 51 P.3d 533; *W. Bluff Neighborhood Ass'n v. City of Albuquerque,* 2002–NMCA–075, ¶¶ 6–7, 132 N.M. 433, 50 P.3d 182; *Gould v. Santa Fe County,* 2001–NMCA–107, ¶ 8, 131 N.M. 405, 37 P.3d 122.

{17} Applying the same standard of review that the district court applied in this matter, we thus review the Commission's order to determine if it is arbitrary, capricious, or an abuse of discretion; not supported by substantial evidence in the record; or, otherwise not in accordance with law. *See* Section 69–36–16(F). A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record. *Snyder Ranches, Inc. v. Oil Conservation Comm'n*, 110 N.M. 637, 639, 798 P.2d 587, 589 (1990); *see Hobbs Gas Co. v. N.M. Serv. Comm'n*, 115 N.M. 678, 680, 858 P.2d 54, 56 (1993) (stating that burden on review of administrative decision under arbitrary and capricious standard is to show that the decision is "unreasonable or unlawful.") In making these determinations, we must remain mindful that "in resolving ambiguities in the statute or regulations which an agency is charged with administering, the Court generally will defer to the agency's interpretation if it implicates agency expertise." *Atlixco*, 1998–NMCA–134, ¶ 30, 125 N.M. 786, 965 P.2d 370; *see Chavez*, 1996–NMSC–070, ¶ 21, 122 N.M. 579, 929 P.2d 971. Further, "[t]raditionally, cases have uniformly held the hearing of an administrative appeal at the district court level is an appellate procedure, *not a trial de novo.*" *Groendyke Transp., Inc. v. N.M. State Corp. Comm'n*, 101 N.M. 470, 476, 684 P.2d 1135, 1141 (1984) (emphasis added). "It is not the function of the trial court to retry the case ... admit new evidence unless under an [statutory] exception ... or substitute its judgment for that of [an administrative agency]." *Id.* (internal citations omitted). However, we will not defer to the Commission's or the district court's statutory interpretation, as this is a matter of law that we review de novo. *See Mutz v. Mun. Boundary Comm'n*, 101 N.M. 694, 697–98, 688 P.2d 12, 15–16 (1984).

## B. The New Mexico Mining Act

{18} Our analysis of the issues in this case must comport with the broad discretion expressly vested in the Commission and MMD pursuant to the Mining Act to promulgate and enforce regulations for the purpose of promoting "responsible utilization and reclamation of lands affected by exploration, mining or the extraction of minerals that are vital to the welfare of New Mexico." NMSA 1978, § 69–36–2 (1993) (stating purpose of Mining Act); *see Old Abe Co. v. N.M. Mineral Comm'n*, 121 N.M. 83, 93, 908 P.2d 776, 786 (Ct.App.1995) ("Only by granting certain discretion to the Director to administer and enforce the regulations could the [Mining] Act be effectively implemented."). For example, the Mining Act provides that the Commission shall "adopt and file reasonable regulations consistent with the purposes and intent of [the Mining Act] necessary to implement the provisions of [the Mining Act], including regulations that: (1) consider the economic and environmental effects of their implementation...." Section 69–36–7(A). Of particular importance to this appeal, the Commission is required to "adopt regulations that provide for permit modifications." Section 69–36–7(D). With regard to permit modifications, as discussed below, the Mining Act requires the Commission to adopt regulations allowing for the addition or expansion of mining "units" to existing mining operations, but consistent with the tenor of the Mining Act as a whole, grants the Commission wide authority to determine the manner in which to do so. *See* § 69–36–7(D) & (G).

{19} The Court of Appeals held that the Commission correctly ruled in its final order that the Director of the MMD "acted within her authority [under the Mining Act] in (1) modifying a mining permit to include an area outside the original permit boundaries, and then (2) issuing a permit for a proposed mine within the expanded boundaries as a new unit of an existing mining operation." *Sierra Club*, 2001–NMCA–047, ¶ 1, 130 N.M. 497, 27 P.3d 984. The Court of Appeals reasoned that the plain language of the Mining Act "neither authorizes nor prohibits modifying a permit to allow an expansion of the existing permit area." *Id.* ¶ 18. Given the broad discretionary authority granted to the Commission in implementing the purposes of the Mining Act, the Court of Appeals concluded that the legislature implicitly delegated authority for this decision to the MMD and the Commission. *Id.* ¶¶ 20–21. We agree, for the following reasons.

{20} The Mining Act provides for the regulation of three types of mining operations: (1) an existing mining operation; (2) a new mining operation; and, (3) a new or expanded unit of a mining operation. An existing mining operation is "an *extraction operation* that produced marketable minerals for a total of at least two years between January 1, 1970 and the effective date of the New Mexico Mining Act[.]" NMSA 1978, § 69–36–3(E) (1993) (emphasis added). A new mining operation is "a *mining operation* that engages in a development or extraction operation after the effective date of the New Mexico Mining Act and that is not an existing mining operation." Section 69–36–3(I) (emphasis added). Conspicuously absent from the Mining Act is a definition of an "extraction operation" or a "mining operation."

{21} Neither does the Mining Act specifically define a mining unit. Instead, the Mining Act refers obliquely to such units. For example, the environmental site assessment that a mine operator is required to submit before a permit may be issued for an existing mining operation shall include "a description of the design limits for each *unit*, including waste units, impoundments and stockpiles and leach piles." Section 69–36–5(B)(7) (emphasis added). Further, the Mining Act states with regard to modification of mining permits that:

> A permit modification to the permit for an existing mining operation shall be obtained for each *new* discrete processing, leaching, excavation, storage or stockpile *unit* located within the permit area of an existing mining operation *and for each expansion of such a unit* identified in the permit for an existing mining operation that exceeds the design limits specified in the permit.

Section 69–36–7(D) (emphasis added); *see also* § 69–36–7(G) (stating that the permit for an existing mining operation "may be modified for new mining units, expansions beyond the design limits of a unit at an existing mining operation or standby status[.]"). The regulations shall require that permit modifications for such units be approved if the director determines that the unit will:

> (1) comply with the regulations regarding permit modifications;
>
> (2) incorporate the requirements of Paragraphs (1), (2), (4), (5) and (6) of Subsection H of this section; [11] and
>
> (3) be sited and constructed in a manner that facilitates, to the maximum extent practicable, contemporaneous reclamation consistent with the closeout plan[.]

Section 69–36–7(D).

## C. The Mining Act Rules

{22} The administrative regulations ("the Rules") promulgated by the Commission add little in the way of specificity to the statutes. Initially, the Rules define a "unit" as "a component of a mining operation including but not limited to processing, leaching, excavation, storage, stockpile or waste units." [12] 19.10.1.7 NMAC. Regarding permit modifications, the regulations mirror the statute, and provide that:

> A permit modification or revision for a mining operation is required for each new discrete processing, leaching, excavation, storage or stockpile unit located within the permit area and not identified in the permit and for each expansion of such a unit identified in the permit that exceeds the design limits specified in the permit for such units. Modifications or revisions will be approved if the Director determines that the unit will:
>
> (1) incorporate the requirements of paragraphs 1, 2, 4, 5 and 6 of subsection H of Section 69–36–7 of the Act;

---

**11.** As the Court of Appeals observed, new mining units are subject to many, but not all, of the environmental safeguards applicable to a new mining operation. *Sierra Club*, 2001–NMCA–047, ¶ 3, 130 N.M. 497, 27 P.3d 984. Existing mining operations are subject to the least stringent standards. *Id.*

**12.** The parties do not directly raise the issue of whether the El Cajete Mine falls within the definition of a "unit," although this would seem to be critical to our determination. Rather, Sierra Club has framed the issue, in light of Section 69–36–7(D), as whether the Mining Commission acted within its authority to permit El Cajete as a unit to the Las Conchas Mine only after expanding the original permit area for Las Conchas.

(2) be sited and constructed in a manner that facilitates, to the maximum extent practicable, contemporaneous reclamation consistent with the closeout plan; and

(3) meet all the requirements of 19.10.5 NMAC.

19.10.5.505(D) NMAC. The regulations adopted by the Commission also provide that:

New discrete processing, leaching, excavation, storage or stockpile units located within the permit area of an existing mining operation and not identified in the permit of an existing mining operation, and for each expansion of such a unit identified in the permit for an existing mining operation that exceeds the design limits specified in the permit must meet the reclamation standard set forth in Subsection A of 19.10.5.507 NMAC above and must also comply with the standards and requirements set forth below. Site-specific characteristics, including the existing mining operation, must be considered in applying the standards and requirements.

19.10.5.508 NMAC. The regulation goes on to list numerous standards and requirements for new and expanded mining units. *Id.*

{23} Finally, the respondents rely on 19.10.5.502 NMAC (addressing "permit application requirements") as support for the Commission's order. That rule provides that:

Where physically separate but interrelated mining operations are located in close proximity to each other and are under the control of same owner or operator, the applicant may request or the Director may determine to issue one permit for all of the operations and require only one permit application and closeout plan.

19.10.5.502(F) NMAC. Sierra Club maintains that this rule has no application to the instant matter.

**D. Application of the Law**

{24} The thrust of Sierra Club's argument is that the express language of Section 69–36–7, providing for the modification of permits for the addition of units *"located within the permit area of an existing mining operation ...,"* prohibits the expansion of a permit area for an existing mining operation, like Las Conchas. Section 69–36–7(D) (emphasis added). On its face, however, the statute includes no such restriction. Section 69–36–7(D) merely states that the Commission shall adopt regulations that provide for permit modifications for the purpose of including new mining units within existing permit areas. The statute simply does not address whether a fixed permit area may or may not be expanded. Nor does a reading of the Mining Act as implicitly permitting an expansion of a permit area necessarily fall contrary to the intent of Section 69–36–7(D) in light of the overall objectives of the Mining Act.

{25} Initially, we note that the district court below correctly observed that the Mining Act neither provides for nor prohibits the expansion of a mining permit area. On that basis, the court concluded that MMD's assertion of authority in this regard was "erroneous and inconsistent with law." However, "[a]gencies and individuals with important responsibilities must have considerable discretion in order to fulfill their responsibilities effectively. Inadequate discretion probably is a larger problem than excessive discretion." *Old Abe,* 121 N.M. at 92–93, 908 P.2d at 786–87 (quoting 3 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 17.1, at 98 (3rd ed.1994)). "The court will confer a heightened degree of deference to legal questions that 'implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function.' " *Morningstar,* 120 N.M. at 583, 904 P.2d at 32; *see also N.M. Mining Ass'n v. N.M. Mining Comm'n,* 1996–NMCA–098, ¶ 15, 122 N.M. 332, 924 P.2d 741 ("Rules adopted by an administrative agency will be upheld if they are in harmony with the agency's express statutory authority or spring from those powers or may be fairly implied therefrom."). The application of these principles is particularly compelling where, as here, the legislature has conferred such a broad swath of authority upon the administrative agencies charged with effectuating the underlying purposes of the act. As discussed below, we therefore determine that the district court erred in its decision that the Commission

acted outside of its authority under the Mining Act by affirming Director's decision to expand the Las Conchas permit area.

{26} First, Section 69–36–7(G), like Section 69–36–7(D), provides that permits for existing mines may be modified to include new mining units. Section 69–36–7(G), however, does not make any reference to the permit area with regard to a permit modification to account for new mining units. *Cf.* § 69–36–7(D). As Section 69–36–7(D) already addresses the modification of permits for new mining units within the permit area of an existing mining operation, attributing a like reading to Section 69–36–7(G) would improperly render this section surplusage, especially under Sierra Club's interpretation of Section 69–36–7(D) as prohibiting the expansion of a permit area. *See Whitely v. N.M. State Pers. Bd.,* 115 N.M. 308, 311, 850 P.2d 1011, 1014 (1993) ("No part of a statute should be construed so that it is rendered surplusage.")

{27} On this point, the dissent argues that we have read Section 69–36–7(G) out of context. Dissenting opinion, ¶ 49. However, the plain language of Section 69–36–7(G) with regard to modification of a permit for new mining units is clear, and need not be taken out of context to support the interpretation of the statute stated above. To the contrary, the dissent seems to read language into the statute that simply is not there. Section 69–36–7(G) states that the Commission shall:

> [E]stablish by regulation a procedure for the issuance of a permit for an existing mining operation and for modifications of that permit to incorporate approved closeout plans or portions of closeout plans and financial assurance requirements for performance of the closeout plans. The permit shall describe the permit area of the existing mining operation and the design limits of units of the existing mining operation based upon the site assessment submitted by the operator.... *The permit may be modified for new mining units....*

(Emphasis added.) This section is not limited to modifications relating to closeout plans, as the dissent suggests, but relates primarily to the adoption of rules and regulations for the issuance of permits for existing mines,

pursuant to NMSA 1978, § 69–36–11 (1993), and for various modifications to permits for existing mines, including modifications for new units without regard to the permit area. If the legislature intended to prohibit the expansion of a permit area, it certainly could have expressly stated so. However, neither Section 69–36–7(D) nor Section 69–36–7(G) contain such a restriction.

{28} Second, we disagree with the dissent's assessment that "[t]o permit an 'expansion' of the fixed permit area in order to incorporate a new unit seems to be an end run around Section 69–36–7(D)." Dissenting opinion, ¶ 48. As MMD points out, the "within the permit area" language of Section 69–36–7(D) acts to eliminate a potential argument by mine operators that new units located within the boundaries of an existing permit area should be considered merely part of an existing mining operation, and as such, subject to the lowest reclamation standards. Instead, it is evident that the legislature intended to strike a balance between the standards applicable to new mining operations and those for existing mining operations for mining units "located within the permit area of an existing mine" by specifically providing for the modification of existing permits to include such units, which are subject to intermediate environmental safeguards. Section 69–36–7(D). This interpretation corresponds well with the overall purpose of the Mining Act to strike a balance between the economic and environmental impacts of mining. See § 69–36–2.

{29} Third, Sierra Club's reading of Section 69–36–7(D) could lead to untenable results. It is reasonable to expect that a mining operation, whose useful life might span decades, may have need to expand certain aspects of its operations outside of an existing permit area depending on various economic or environmental factors. However, under Sierra Club's reasoning, each such expansion would have to be permitted under the rigorous standards for a new mining operation. For example, a new stockpile or processing facility just outside the boundaries of an existing permit area would have to be permitted as a new mining operation, for which a mine operator would have to

submit a separate site assessment, reclamation plan, and one year of baseline data. *See* §§ 69–36–5, 69–36–12. We believe that such a construction of the Mining Act would place an unnecessary economic burden on mine operators, unduly tax the state's administrative resources, and eventually prove unworkable. We therefore hold that, absent an express provision by the legislature to the contrary, the permit area fixed for a given mining operation may be expanded under certain circumstances to accommodate new or expanded mining units.

{30} That is not to say that MMD's and the Commission's discretion is unbounded. The decision of whether a proposed mining activity is a new mining unit or a new mining operation must be reasonable and have a rational basis. *See Snyder,* 110 N.M. at 639, 798 P.2d at 589. Further, a new mining operation may *not* be included as a unit in an expanded permit area for an existing mining operation,[13] because such a result would eviscerate the stringent environmental safeguards governing those operations under the Mining Act, including, for example, that the operator submit one year of baseline data before a permit may be issued. *See* § 69–36–12(A).

{31} Here, MMD and the Commission ultimately acted within their discretion in ruling that El Cajete was a new mining unit of Las Conchas, rather than a new mining operation. In determining that the revised permit issued by MMD was proper, the Commission relied on Rule 19.10.5.502(F) to establish that Las Conchas and El Cajete are not separate mining operations.[14] Sierra Club argues that Rule 19.10.5.502(F) does not govern, because it does not provide for the aggregation of already permitted mines with unpermitted new mines. Strictly speaking, Sierra Club is correct on this issue; the rule speaks in terms of "interrelated mining

operations," which have yet to be permitted. 19.10.5.502(F) NMAC. However, we find as a matter of law that the Commission could properly have relied on the factors set out in the rule, *i.e.* interrelatedness and common ownership, not as controlling, but as a touchstone of reasonableness to arrive at its determination that El Cajete is a mining unit, rather than a distinct mining operation.

{32} Ultimately, the Commission is charged with the determination of whether a given mining activity is a mining "unit" or a mining "operation," as neither of those terms are specifically defined in the Mining Act. This determination is critical, because as stated above the Mining Act does not allow a new mining operation to be permitted as a unit within an expanded permit area for an existing mining operation.[15] Absent guidance from the legislature on this issue, the Commission reasonably relied on its expertise in applying the factors set forth in Rule 19.10.5.502(F) to the stipulated facts in determining that El Cajete is a mining unit, rather than a new mining operation.

{33} Copar's common ownership of both Las Conchas and El Cajete is undisputed. Additionally, there were ample facts to support the conclusion that Las Conchas and El Cajete are substantially interrelated. Copar submitted a joint site assessment in its application for a permit covering both Las Conchas and El Cajete, because it considered El Cajete to be an extension of the existing mining operation at Las Conchas. The information contained in the site assessment, and in the EIS, provided MMD with substantial information about El Cajete's potential environmental impacts. The two mines are in the same geologic formation, and are 1.1 miles apart. Copar proposed to permit the areas together, because it intended to shift its mining activity to El Cajete after the

13. *Cf.* § 69–36–5(B)(7) (providing that an existing mining *unit* may be included in both the site assessment and the eventual permit for an existing mine).

14. Specifically, the Commission concluded that, "[because the same party owns the El Cajete and Las Conchas sites and they are in close proximity, [Rule 19.10.5.502(F) ] applies and [MMD] ap-

propriately categorized El Cajete as a new unit of an existing mining operation]."

15. We do not address whether or to what extent a "minimal impact mining operation," as defined by the Rules, would fall within an exception to the general rule announced here. *See* 19.10.1.7(M)(2) NMAC.

supply of pumice at Las Conchas began to play out.

{34} The facts were disputed regarding whether MMD considered El Cajete an existing mining operation, as part of Las Conchas, or a new mining operation during the initial permitting phase. However, the parties do not dispute that MMD wanted to issue a permit for Las Conchas expeditiously so that it would have oversight of Copar's reclamation efforts, already underway at Las Conchas. To accomplish this important objective, MMD stated that it would accept a permit boundary for the Las Conchas site alone, but that El Cajete might be brought into the Las Conchas permit at a later date. Given MMD's expertise in the area of permitting and enforcement under the Mining Act, the Director's decision to strike a compromise in the regulation of El Cajete based on the good-faith dispute over that site's classification, in order to promote the effective reclamation of Las Conchas, was reasonable in light of the purposes of the Mining Act. *See Chavez*, 1996–NMSC–070, ¶¶ 20–21, 122 N.M. 579, 929 P.2d 971 (stating a general rule that courts will defer to agency determinations if they are within agency's area of specialization or implicate agency expertise). Moreover, the Commission's order affirming that decision was sound under our interpretation of the Mining Act as set forth above. Accordingly, we hold that the Commission's order was not arbitrary, capricious or an abuse of discretion, and that it is in accordance with the law.

{35} Finally, Sierra Club argues that the Commission's order will lead to a "leapfrogging" effect of endlessly expanding mining areas, in contravention to the purpose of the Mining Act to protect the environment. Sierra Club points out that the permit area in the instant case was enlarged by an area over twenty-five times larger than the original permit area for Las Conchas. As the Court of Appeals noted, Sierra Club's concern is well-founded. *Sierra Club*, 2001–NMCA–047, ¶ 28, 130 N.M. 497, 27 P.3d 984. However, as we stated above, any determination to expand a permit area to include a new mining unit must be reasonable, and "any interpretation of this opinion by MMD, the Commission, or the mining industry that would invite such a wholesale circumvention of the Act would be a grave miscalculation." *Id.* Further, we note that mining permits, such as the revised permit here, specifically delineate the areas within the permit area authorized for mining disturbance. *See* § 69–36–7(D). Additional activity within the enlarged Las Conchas/El Cajete permit area may not be initiated absent further permit modifications for additional units.

{36} Operators seeking a permit for an existing mining operation, like those seeking a permit for a new mining operation, must submit a site assessment containing detailed information regarding the mine's environmental impacts and a proposed permit area for the mine.[16] *See* § 69–36–5(B). In lieu of a site assessment for an existing mine, "the operator or owner of an existing mining operation that has completed all reclamation measures may apply to the director for an inspection of the reclaimed areas to determine whether the completed reclamation satisfies the requirements of the [Mining Act] and the substantive requirements for reclamation pursuant to the applicable regulatory standards." Section 69–36–5(E). Existing mining operations require a "permit application ... contain[ing] all information required by regulation of the commission, including a proposed compliance schedule for submission of a closeout plan within the shortest time practicable." Section 69–36–11(A). The Act

---

**16.** Consistent with the requirement that a mine operator submit a proposed permit area for an existing mine with its site assessment, Copar submitted a proposed permit area that encompassed the El Cajete and Las Conchas mines. As the Court of Appeals observed, "[i]f the original permit area had included the entire area for which Copar had valid mining claims, then El Cajete might have been permitted as an existing mine. . . . At the most, El Cajete would have been permitted as a new unit located within the per-

mit area of an existing mining operation. . . ." *Sierra Club*, 2001–NMCA–047, ¶ 23, 130 N.M. 497, 27 P.3d 984. "If MMD and the Commission could have taken direct action initially by putting both mines in one permit area and then permitting El Cajete as a new unit, we fail to see how MMD and the Commission are unreasonable in applying their own rules in such a manner as to achieve the same result indirectly by a two-step process." *Id.* ¶ 24.

directs the Mining Commission to "adopt regulations that require and provide for the issuance and renewal of permits for ... existing mining operations and exploration and that establish schedules to bring existing mining operations into compliance with the requirements of the [Mining Act.]" NMSA 1978, Section 69–36–7(C)(1997).

{37} These requirements demonstrate that the Legislature did not intend to create a "grandfather" exception for existing mines, as the dissent contends. Dissenting opinion, ¶ 44. Existing mines are not "a special exception from the general requirements of a statute." *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers,* 1998–NMSC–020, ¶ 24, 125 N.M. 401, 962 P.2d 1236. Nor does the Mining Act "prevent ... [existing mines] from being altered or imposed upon." *Id.* ¶ 25. Rather, existing mines are subject to numerous restrictions and requirements consistent with the purpose of the Mining Act to foster environmental stewardship.

{38} We therefore affirm the Court of Appeals, and remand to the district court for entry of an order affirming the Commission's September 16, 1998 order upholding the Director's revision of Copar's mining permit for Las Conchas to include the El Cajete mining unit.

{39} **IT IS SO ORDERED.**

WE CONCUR: GENE E. FRANCHINI, PAMELA B. MINZNER, and PETRA JIMENEZ MAES, Justices.

SERNA, Chief Justice (dissenting).

{40} Respectfully, I dissent from the majority opinion. I would reverse the Court of Appeals and affirm the district court. I also respectfully disagree with the majority's discussion regarding certiorari and the standard of review.

{41} As the majority states, we review statutory interpretation questions de novo. I believe that the section regarding the standard of review is advisory. I disagree with the majority's limitation of *State v. Conn,* 115 N.M. 99, 847 P.2d 744 (1993), and I would not overrule the Court of Appeals' cases.

**New Mexico Mining Act**

{42} Regarding the legal issue before the Court, whether the New Mexico Mining Act, NMSA 1978, §§ 69–36–1 to –20 (1993, as amended through 2001), authorizes the director to modify an existing mining permit to include an area outside the original boundaries and subsequently issue a permit for a proposed mine within these expanded boundaries as a new unit of an existing mining operation, I believe that the statutes do not authorize such actions. The Legislature's purposes for the New Mexico Mining Act "include promoting responsible utilization and reclamation of lands affected by exploration, mining or the extraction of minerals that are vital to the welfare of New Mexico." NMSA 1978, § 69–36–2 (1993). The Legislature has defined " 'reclamation' " as "the employment during and after a mining operation of measures designed to mitigate the disturbance of affected areas and permit areas and to the extent practicable, provide for the stabilization of a permit area following closure that will minimize future impact to the environment from the mining operation and protect air and water resources." NMSA 1978, § 69–36–3(K) (1993). Thus, the New Mexico Mining Act involves balancing responsible use for mining with environmental concerns.

{43} As I read the statutes, there are existing mines, grandfathered into a more protected status with the least stringent regulations, new units of existing mines located within the original permit boundaries, also receiving less stringent regulations, and new mines, subject to the greatest burdens and restrictions. The definition of an " 'existing mining operation' " is clear: it is "an extraction operation that produced marketable minerals for a total of at least two years between January 1, 1970 and the effective date of the New Mexico Mining Act." Section 69–36–3(E). Categorization as an existing mining operation is most desirable from a mining company's viewpoint because it is an exception to tougher requirements under the New Mexico Mining Act. In order to qualify as a new unit of an existing mine, I believe the statute clearly states that the new unit must be located within the original permit bound-

aries. To allow expansion of the original boundaries in order to encompass the "new units" is, to me, an end run around the New Mexico Mining Act, as explained below.

{44} As recognized by all of those involved in this case, the New Mexico Mining Act regulates new mines most extensively, new units of existing mines less so, and existing mines the least. I believe this indicates that the Legislature intended to create a "grandfather" exception for existing mines. *See Regents of Univ. of N.M. v. N.M. Fed'n of Teachers,* 1998–NMSC–020, ¶¶ 23–24, 125 N.M. 401, 962 P.2d 1236 (stating that " 'grandfather clauses,' 'savings clauses,' 'exemptions,' and 'provisos' " are "types of statutory provisions [which] delineate a special exception from the general requirements of a statute").

> These laws do not usually create rights or requirements, but rather prevent an entity from being altered or imposed upon by a new statute. A grandfather clause preserves something old, while the remainder of the law of which it is a part institutes something new. A grandfather clause may have the effect of relieving an entity from submitting to new restrictions, or the clause may have the reverse effect of permitting the entity to avoid broadening the scope of its activities. The grandfather clause may extend prerogatives to those already receiving them, while denying those same prerogatives or imposing additional obligations upon the remainder of the class.

*Id.* ¶ 25 (citation omitted). The New Mexico Mining Act places fewer restrictions and burdens on existing mines, as noted by the parties as well as the majority, to avoid imposing stringent burdens on companies engaged in mining operations prior to enactment of the statutes. *See* § 69–36–3(E).

> New statutory restrictions or requirements can, in many circumstances, impose hardships upon enterprises whose activities were well established prior to the law's enactment. By including grandfather provisions into a new law, the Legislature recognizes that there are classes of entities who could be damaged by the blanket and unrestricted application of new rules.

*Regents,* 1998–NMSC–020, ¶ 26, 125 N.M. 401, 962 P.2d 1236.

{45} The involvement of a grandfather clause should guide our statutory interpretation of this case. I view the protected status of existing mining operations as the exception to the general rule of the environmental requirements applying to new mining operations.

> Generally, in resolving statutory ambiguities, courts will favor a general provision over an exception. This is especially true when a statute promotes the public welfare. Because of this judicial predilection, strict or narrow construction is usually applied to exceptions to the general operation of a law. For this reason, *a grandfather clause will be construed to include no case not clearly within the purpose, letter, or express terms, of the clause.* "In interpreting the exceptions to the generality of the grant, courts include only those circumstances which are within the words and reason of the exception." When the scope of a grandfather clause is ambiguous, the court will construe it strictly against the party who seeks to come within its exception.

*Id.* ¶ 27 (citations omitted) (emphasis added). Thus, unless the New Mexico Mining Act explicitly authorizes the expansion of an original permit boundary to encompass "new units" of the existing mine which would otherwise fall outside the permit boundary, I do not believe we can infer such authority from the Act.

{46} The majority declares that a grandfather clause is not implicated in the present case because existing mines are not a special exception and that the Act does not prevent the existing mines from being altered or imposed upon, relying on *Regents.* Majority opinion, ¶ 37. I do not believe complete exception from statutory burdens are required for provisions to be deemed grandfather clauses. As this Court expressed in *Regents,* "[t]he effect of [grandfather clauses] is to *narrow, qualify, or otherwise restrain* the scope of the statute." *Regents,* 1998–NMSC–020, ¶ 24, 125 N.M. 401, 962 P.2d 1236 (emphasis added). Other jurisdictions have also recognized that a provision can be

a limited, rather than complete, exception and still be considered as a grandfather clause. *See, e.g., Miss. Bd. of Nursing v. Belk,* 481 So.2d 826, 830 (Miss.1985) (concluding that a limited grandfather clause for nurse anesthetists is unconstitutional); *Eyl v. Ciba–Geigy Corp.* 264 Neb. 582, 650 N.W.2d 744, 751 (2002) (noting that a provision "provided a grandfather clause that allowed existing devices to remain on the market during the approval process" and that the statute "also allowed devices that were substantially equivalent to preexisting devices to avoid the rigorous approval process by filing a notice and completing a relatively simple approval process"); *Lubinsky v. Fair Haven Zoning Bd.* 148 Vt. 47, 527 A.2d 227, 229 (1986) ("The purpose of the statute is to retain for usefulness pre-existing lots of satisfactory size, even though they do not quite meet zoning limits as to size. It is a sort of limited grandfather clause allowing for limited development on previously laid-out lots that is not seen as unduly disruptive of the desired ends of zoning."). Thus, the construct of a grandfather clause provides appropriate guidance in the present case. We should include only those circumstances which are within the words and reason of the exception. If the scope of a grandfather clause is ambiguous, we ought to construe it strictly against the party who seeks to come within its exception.

{47} The majority comes to the opposite holding. The majority reiterates that "[t]he Court of Appeals reasoned that the plain language of the Mining Act 'neither authorizes nor prohibits modifying a permit to allow an expansion of the existing permit area.' " Majority opinion, ¶ 19 (quoted authority omitted). The majority concludes that Section 69–36–7(D) "simply does not address whether a fixed permit area may or may not be expanded. Nor does a reading of the Mining Act as implicitly permitting an expansion of a permit area necessarily fall contrary to the intent of Section 69–36–7(D) in light of the overall objectives of the Mining Act." Majority opinion, ¶ 24. Thus, the majority apparently concedes that no language in the New Mexico Mining Act explicitly authorizes the expansion of the original permit area to encompass a new unit of an existing mine. To me, this fact is determina-

tive, and I believe the majority's recognition of authority by implication is contrary to our rules of statutory interpretation for what is an exception to the rule. "[A] grandfather clause will be construed to include no case not clearly within the purpose, letter, or express terms of the clause." *Regents,* 1998–NMSC–020, ¶ 27, 125 N.M. 401, 962 P.2d 1236. "[W]e will not read into a statute or ordinance language which is not there, particularly if it makes sense as written." *Id.* ¶ 28 (quoted authority and quotation marks omitted). The majority "note[s] that the district court below correctly observed that the Mining Act neither provides for nor prohibits the expansion of a mining permit area. On that basis, the court concluded that MMD's assertion of authority in this regard was 'unsupported and inconsistent with law.' " Majority opinion, ¶ 25. I believe that the district court was correct.

{48} The majority holds that Section 69–36–7(D) does not contain a restriction for the expansion of a permit area for an existing mining operation and "merely states that the Commission shall adopt regulations that provide for permit modifications for the purpose of including new mining units within existing permit areas." Majority opinion, ¶ 24. I disagree with this interpretation. "Where authority is given to do a particular thing and a mode of doing it is prescribed, it is limited to be done in that mode; all other modes are excluded. This is a part of the so-called doctrine of expressio unius est exclusio alterius." *Bettini v. City of Las Cruces,* 82 N.M. 633, 635, 485 P.2d 967, 969 (1971) (quotation marks and quoted authority omitted). Section 69–36–7(D) does contain limiting language; "for permit modifications," this section provides that

> [a] permit modification to the permit for an existing mining operation shall be obtained for each new discrete processing, leaching, excavation, storage or stockpile unit *located within the permit area of an existing mining operation* and not identified in the permit of an existing mining operation and for each expansion of such a unit identified in the permit for an existing mining operation that exceeds the design limits specified in the permit.

(Emphasis added.) To permit an "expansion" of the fixed permit area in order to incorporate a new unit seems to be an end run around Section 69–36–7(D). "We will not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions." *Regents,* 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236.

{49} The majority opinion states that Section 69–36–7(G) "provides that permits for existing mines may be modified to include new mining units" but "does not make any reference to the permit area with regard to a permit modification to account for new mining units." Majority opinion, ¶ 26. The majority then concludes that because Section 69–36–7(D) addresses the modification of permits for new units within the permit area of an existing operation, "attributing a like reading to Section 69–36–7(G) would improperly render this section surplusage." Majority opinion, ¶ 26. The majority, in my view, appears to be reading Section 69–36–7(G) out of context. This section, by its first phrase, "establish[es] by regulation a procedure for the issuance of a permit for an existing mining operation and for modifications of that permit *to incorporate approved closeout plans or portions of closeout plans and financial assurance requirements for performance of the closeout plans*." Section 69–36–7(G) (emphasis added). Thus, this section does not appear to be authority for modification of new mining units and expansions outside the permit area, supplementing Section 69–36–7(D), but for modifications related to closeout plans. Although the majority contends that I am reading nonexistent language into the statute, the majority instead ignores the second phrase, "to incorporate approved closeout plans," which informs "issuance of a permit for an existing mining operation and for modifications of that permit." *See* Majority opinion, ¶ 27. The only manner in which this provision can be read to authorize modification of permits for a new mining unit is to lift out select sections and disregard those remaining phrases which, through plain language, direct the modifications to "incorpo-

rate approved closeout plans," "contain a schedule for completion of a closeout plan," and "thereafter be modified to incorporate the approved closeout plan." Section 69–36–7(G). Section 69–36–7(D), on the other hand, directs the Commission to "adopt regulations that provide for permit modifications" and is therefore more applicable to the issue in this case than Section 69–36–7(G). The majority concludes that "[i]f the [L]egislature intended to prohibit the expansion of a permit area it certainly could have expressly stated so." Majority opinion, ¶ 28. I find it more instructive to note that the Legislature clearly did not authorize such action.

{50} As noted above, the majority reads Section 69–36–7(D) as addressing modifications for new mining units within the permit area of an existing mining operation and Section 69–36–7(G) as providing for permits for existing mines to include new mining units outside the original permit area. Majority opinion, ¶ 26. If Section 69–36–7(G) were to have the meaning apparently suggested by the majority, then existing mines would be free to create new units outside the permit area without being subject to the restrictions in Section 69–36–7(D). In other words, new units inside the permit area governed by Section 69–36–7(D) would receive greater regulation than new units outside the original boundary in the "affected area," NMSA 1978, § 69–36–3(A) (1993). I am convinced that this was not the Legislature's intent.

{51} The majority defers to "MMD's expertise in the area of permitting and enforcement under the Mining Act," based on the "general rule that courts will defer to agency determinations if they are within [an] agency's area of specialization or implicate agency expertise." Majority opinion, ¶ 34. Although this Court accords some deference to an agency's interpretation of a statute, I would not give such great deference to the agency in the present case. "[T]he court is not bound by the agency's interpretation and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law." *Morningstar Water Users Ass'n v. N.M.*

*Pub. Util. Comm'n,* 120 N.M. 579, 583, 904 P.2d 28, 32 (1995).

{52} The majority distinguishes between a proposed mining activity as a new mining unit versus new mining operations, concluding that "a new mining operation may *not* be included as a unit in an expanded permit area for an existing mining operation, because such a result would eviscerate the stringent environmental safeguards governing those operations under the Mining Act." Majority opinion, ¶ 30 (footnote omitted). This conclusion belies the majority's argument that "existing mines[, and presumably, new units of existing mines] are subject to numerous restrictions and requirements consistent with the purpose of the Mining Act to foster environmental stewardship." Majority opinion, ¶ 37. Instead, this conclusion expresses my concern for the present case, that treating what is a new mining operation as a new unit of an existing mine "eviscerate[s] the stringent environmental safeguards" which ought to apply to the El Cajete mine.

{53} The majority concludes that Sierra Club's construction of the New Mexico Mining Act "would place an unnecessary economic burden on mine operators, unduly tax the state's administrative resources, and eventually prove unworkable." Majority opinion, ¶ 29. First, I believe these concerns are policy choices best left to the Legislature. However, I also do not believe the Legislature intended to give such a sizable advantage to existing mining operations by allowing them simply to expand their permit boundaries in order to receive the benefit of fewer restrictions and burdens. The majority notes that the existing mine, Las Conchas, was thirty-three acres, prior to the expansion in question which added approximately seventy-six additional acres. Majority opinion, ¶ 3. The Sierra Club notes that the outer boundaries of the Las Conchas and El Cajete mines are over a mile apart, and that active mining in the Las Conchas mine ended years before mining began at El Cajete. As interpreted by the majority, I feel the exception for existing mines and new units has swallowed the rule. As the Sierra Club argues, the "decision to place the El Cajete mine outside of any permit area that had been

properly studied for environmental concerns and deem it a new unit rather than a new mine defeats [the][L]egislative scheme." The majority states that "any determination to expand a permit area to include a new mining unit must be reasonable" and warns that "any interpretation of this opinion by MMD, the Commission, or the mining industry that would invite such a wholesale circumvention of the Act would be a grave miscalculation." Majority opinion, ¶ 35 (internal quotation marks and quoted authority omitted). I agree with Sierra Club that this warning rings hollow in light of the considerable expansion of the original permit boundary in the present case to include El Cajete as a new unit of the existing Las Conchas mine.

{54} I would affirm the district court. For the reasons articulated above, I dissent.