# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2022-NMCA-014**

**Filing Date: November 9, 2021**

**No. A-1-CA-37894**

**NUCLEAR WASTE PARTNERSHIP, LLC**
**and UNITED STATES on behalf of UNITED**
**STATES DEPARTMENT OF ENERGY,**

> Applicants-Appellees,

v.

**NUCLEAR WATCH NEW MEXICO**
**and SOUTHWEST RESEARCH AND**
**INFORMATION CENTER,**

> Protestants-Appellants,

and

**STEVE ZAPPE and HAZARDOUS WASTE**
**BUREAU,**

> Protestants,

**IN THE MATTER OF THE DRAFT**
**HAZARDOUS WASTE FACILITY PERMIT**
**FOR CALCULATING FINAL DISPOSAL**
**VOLUMES WASTE ISOLATION PILOT**
**PLANT EPA ID NO. NM4890139088.**

**APPEAL FROM THE NEW MEXICO ENVIRONMENT DEPARTMENT**
**Butch Tongate, Cabinet Secretary**

Released for Publication March 22, 2022.

Law Office of Robert A. Stranahan, IV
Robert A. Stranahan, IV
Santa Fe, NM

Hance Scarborough, LLP
Michael L. Woodward
Austin, TX

Fritz, Byrne, Head & Gilstrap, PLLC
J.D. Head
Austin, TX

Gallagher & Kennedy
Dalva L. Moellenberg
Santa Fe, NM

for Appellee Nuclear Waste Partnership, LLC

United States Department of Justice
Michael H. Hoses, Assistant United States Attorney
Albuquerque, NM

Environment and Natural Resources Division
John E. Sullivan
Sarah Izfar
Washington, DC

for Appellee United States Department of Energy

Lindsay A. Lovejoy, Jr.
Santa Fe, NM

for Appellants

Hector H. Balderas, Attorney General
Santa Fe, NM
Christal Weatherly, Special Assistant Attorney General
Christopher J. Vigil, Special Assistant Attorney General
Albuquerque, NM

for Administrative Agency NM Environment Department

**OPINION**

**BOGARDUS, Judge.**

**{1}** Appellants Southwest Research and Information Center and Nuclear Watch New Mexico appeal the order of the Secretary of the New Mexico Environment Department (NMED) approving a permit modification request that modified the method by which Appellees Nuclear Waste Partnership LLC (NWP) and the U.S. Department of Energy (DOE) track waste volumes disposed of at a radioactive waste repository. Appellants argue that the administrative Hearing Officer, Max Shepherd (the Hearing Officer),

should have been disqualified and that NMED's order was contrary to law, arbitrary and capricious, and an abuse of discretion. Finding no error,[1] we affirm.

**BACKGROUND**

**{2}** The following undisputed facts[2] are reflected in the Hearing Officer's report, which was adopted by NMED. The underlying permit request addresses the method of volumetric measurement for Transuranic (TRU) waste disposed of at a federal repository for radioactive waste material.

**{3}** For shipping and safety reasons, this waste is often packaged inside multiple containers, with an inner waste container placed inside a larger container, a process characterized as "overpacking."[3] At issue here is whether the volume of the waste should be calculated and tracked based on the size of the inner waste container or based on the larger outer container, which includes significant "void space [between the inner and outer container] made of air and/or dunnage (inert material), which is not waste." The outer container volume equates to 30 percent greater volume based on packaging.

**{4}** The containers are disposed of at the Waste Isolation Pilot Plant (WIPP). WIPP is an underground federal repository for radioactive waste material located in New Mexico. WIPP was authorized to "demonstrate the safe disposal of radioactive waste materials generated by atomic energy defense activities" and "isolate and dispose of DOE's inventory of defense [TRU] waste in a manner that protects public health and the environment." The WIPP facility consists of Hazardous Waste Disposal Units (HWDUs), which are underground rooms designated for the disposal of waste containers. In practice, the TRU waste disposed of at WIPP is "TRU mixed waste[,]" which contains radioactive waste mixed with hazardous waste.

**I.     Statutory Background**

**{5}** Radioactive materials are regulated by DOE, pursuant to the Atomic Energy Act of 1954. Hazardous materials, by contrast, are regulated by NMED, pursuant to the Resource Conservation and Recovery Act (RCRA), which authorized the State to implement a hazardous waste program "equivalent to" the federal RCRA requirements. 42 U.S.C. § 6926(b)(1). This equivalent hazardous waste program was enacted through the New Mexico Hazardous Waste Act (HWA), NMSA 1978, Sections 74-4-1 to -14 (1977, as amended through 2018), which adopted RCRA regulations and authorized

---

1Appellants' briefing cited to the administrative record rather than the record proper, in violation of Rule 12-318(A)(3) NMRA, which needlessly complicated our review, especially given that the record proper contained 104 volumes. Appellants are reminded to comply with this rule in the future.

2Although Appellants note in their briefing that some of the Hearing Officer's findings of fact failed to cite to the record, Appellants do not argue that any of the specific findings were not supported by substantial evidence and characterize the issues on appeal as "legal, not factual." Thus, we accept that the Hearing Officer's findings of facts, as adopted by NMED's order, are supported by substantial evidence. *See* Rule 12-318(A)(3).

3See appendix for diagrams of overpacked containers (Exhibits D & E).

NMED to regulate WIPP and issue permits regarding storage of hazardous waste at WIPP. Thus, NMED, pursuant to its RCRA authority, "has regulatory authority over the hazardous waste portion of TRU mixed waste." NMED "manages all waste emplaced at WIPP as TRU mixed waste."

{6}     With regard to the volumetric waste capacity of TRU waste at WIPP, the Waste Isolation Pilot Plant Land Withdrawal Act (LWA) of 1992, limits its total amount to 6.2 million cubic feet. Pub. L. No. 102-579, 106 Stat. 4777 as amended by Pub. L. No. 104-201, 110 Stat. 2422 (1996). The LWA, however, does not specify a volumetric calculation method for TRU waste or TRU mixed waste.

## A.     The Permit Modification Request

{7}     As co-operators of WIPP, DOE and NWP (Permittees) held a permit to dispose of TRU mixed waste at WIPP but sought NMED approval to modify their permit. The original permit anticipated the emplacement of 6.2 million cubic feet of TRU mixed waste based on the assumption that the waste containers would be *full* of TRU mixed waste. The assumption that the containers would be full, however, proved to be incorrect. In practice, many containers shipped from the generator and storage sites were not full but rather *overpacked*, as described above. Because the permit incorrectly assumed the containers would be full of TRU mixed waste, this "creat[ed] a de facto limit that could result in underutilizing the WIPP facility." Before the permit modification at issue, the method of determining the volume of TRU mixed waste at WIPP was not explicitly stated in the permit.

{8}     Permittees submitted to NMED a permit modification request (PMR[4]), proposing two distinct methods for measuring waste volume to distinguish between TRU mixed waste and TRU waste. Following public notice, meetings, and comments, the Hearing Officer issued a report recommending the creation of two distinct volume calculation methods in the permit, stating, "The first type of calculation [based on TRU mixed waste] is based on the outermost disposal container and . . . pertains to RCRA requirements. "The second type of calculation is based on the [TRU] waste inside the disposal containers and pertains to the LWA capacity limit." The Hearing Officer reasoned that the outer container volume "is only significant for the emplacement footprint of waste" in an HWDU at the WIPP—because HWDUs have a maximum physical capacity—whereas only the volume of TRU waste *inside* the disposal container pertains to and is significant for the LWA capacity limit of 6.2 million cubic feet.

{9}     The PMR did not seek an increase of WIPP's disposal capacity, but rather sought to clarify that the maximum capacity of the WIPP facility as it pertained to the Permit under RCRA was based on the TRU mixed waste capacities of the individual HWDUs rather than on the limitation established in the LWA. The Hearing Officer noted that although tracking the LWA TRU waste volume based on the inner container separately from the RCRA TRU mixed waste volume based on the outer container

---

4As used throughout this opinion, "PMR" refers to the final draft version submitted to the Hearing Officer and adopted by NMED order.

could theoretically increase WIPP's emplacement footprint by approximately 30 percent, the Permittees would have to submit an additional PMR to increase the footprint of WIPP. NMED adopted the Hearing Officer's recommendation and approved the PMR. Appellants contend NMED erred in approving the PMR.

**DISCUSSION**

**II.  Appellants Failed to Preserve Their Argument That the Hearing Officer Should Have Been Disqualified**

**{10}**    Appellants first argue the Hearing Officer should have been disqualified and his report and NMED's order vacated, because of his contract with NMED. Appellants contend the failure to disqualify the Hearing Officer was a "fatal flaw" in the process, denying litigants an impartial tribunal and violating their due process rights. Appellants fail to cite to any evidence establishing that the Hearing Officer's decision in this case reflected prejudice or bias; instead Appellants rely solely on the Hearing Officer's contract with NMED, which provided for payment at an hourly rate.[5] Appellants contend that payment alone provided an incentive to handle hearings to NMED's satisfaction. Appellants failed to preserve this issue by raising it below, raising it only after NMED issued its order, and we decline to reach it. *See* Rule 12-321(A) NMRA; *State v. Leon*, 2013-NMCA-011, ¶ 33, 292 P.3d 493 ("We generally do not consider issues on appeal that are not preserved below." (internal quotation marks and citation omitted)); *Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 3, 140 N.M. 49, 139 P.3d 209 (declining to reach an issue the appellant did not raise before the hearing officer).

**III.  NMED's Order Is Proper**

**{11}**    Appellants next argue NMED improperly ordered approval of the PMR. Under the HWA, this Court reviews an administrative order of NMED to determine whether the order is "arbitrary, capricious or an abuse of discretion; . . . not supported by substantial evidence in the record; or . . . otherwise not in accordance with law." Section 74-4-14(C). Appellants bear the burden of showing relief is warranted. *Doña Ana Mut. Domestic Water Consumers Ass'n v. N.M. Pub. Regul. Comm'n*, 2006-NMSC-032, ¶ 9, 140 N.M. 6, 139 P.3d 166. We review an agency's conclusions of law de novo. *Law v. N.M. Hum. Servs. Dep't*, 2019-NMCA-066, ¶ 11, 451 P.3d 91.

**A.  NMED's Order Is in Accordance With Applicable Law**

**{12}**    Appellants raise five arguments to support their contention that NMED's order approving the PMR was not in accordance with the law. Appellants contend NMED's order (1) abandons the State's authority under RCRA, (2) misinterprets the LWA, (3) creates a conflict between RCRA and the LWA, (4) DOE lacks the authority to interpret or enforce the terms of the LWA, and (5) the order violates a Consultation and Coordination agreement between the State and DOE. "The term 'not in accordance with

---

5Appellants did not introduce the contract during the hearing, but instead included it as an exhibit to their brief in chief on appeal.

law' involves action taken by an agency or court which is based on an error of law, is arbitrary and unreasonable, or is based on conjecture, and is inconsistent with established facts." *Perkins v. Dep't of Hum. Servs.*, 1987-NMCA-148, ¶ 22, 106 N.M. 651, 748 P.2d 24. "Whether [NMED's] actions were contrary to law is a question reviewed de novo." *Smyers v. City of Albuquerque*, 2006-NMCA-095, ¶ 5, 140 N.M. 198, 141 P.3d 542. Additionally, we review an agency's rulings regarding statutory construction de novo. *Albuquerque Bernalillo Cnty. Water Util. Auth. v. N.M. Pub. Regulation Comm'n*, 2010-NMSC-013, ¶ 50, 148 N.M. 21, 229 P.3d 494. We consider each of Appellants' points in turn and conclude that none of them provide a basis for vacating NMED's order.

## 1.      NMED's Order Is in Accordance with RCRA and the HWA

**{13}**    Appellants argue NMED's order abandons its authority under RCRA. They contend RCRA regulations require NMED to "consider the nature and volume of the wastes proposed for disposal and how hazardous wastes might escape, and to issue a permit that protects human health and the environment[,]" and that NMED must continue to enforce a waste volume limit measured by the outer waste container, as it did for nineteen years under the previous permit. We disagree that a previous permit is not subject to change and remain unpersuaded by Appellants' argument that the revised permit is contrary to RCRA or its regulations.

**{14}**    RCRA's primary purpose is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, "so as to minimize the present and future threat to human health and the environment." 42 U.S.C. § 6902(b). RCRA authorizes states to administer a hazardous waste program in lieu of the federal program, as long as the state program is " 'equivalent to' [and] no less stringent than the federal [requirements]." *See* 42 U.S.C. § 6926(b) (authorizing the states to, among other things, "issue . . . permits for the storage . . . or disposal of hazardous waste)." The HWA, in turn, authorizes NMED to administer the State's hazardous waste management program consistent with RCRA. *See* § 74-4-4(A); *Sw. Rsch. & Info. Ctr. v. N.M. Env't Dep't*, 2014-NMCA-098, ¶ 9, 336 P.3d 404.

**{15}**    Appellants point to no RCRA or HWA provision or regulation requiring that the outer container be used to measure emplacement volume. In fact, RCRA authorizes states to carry out a hazardous waste program and issue permits for storage and disposal of hazardous waste consistent with federal requirements, *see* 42 U.S.C. § 6926(b), and the HWA provides that permittees may submit permit modification requests to NMED, and that NMED is charged with issuing a decision. *See* § 74-4-4.2(D), (G)(2) (stating that "a permit may be modified at the request of the permittee" and that decision is within the purview of NMED). Because RCRA authorizes states to issue permits and the HWA authorizes NMED to modify permits, we are unpersuaded by Appellants' argument that NMED must continue to enforce the permit exactly as it

has in the past. While Appellants cite RCRA regulations[6] to support their argument that NMED abandoned its authority under RCRA, these regulations neither specify that the outer container must be the lone measure of waste emplacement volume nor indicate that including additional tracking data pertaining to the inner waste container volume would adversely affect human health or the environment.

**{16}** We cannot say NMED's order to approve the PMR is not in harmony with its statutory authority under either RCRA or the HWA. *See Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 25, 133 N.M. 97, 61 P.3d 806 (noting that the "[r]ules adopted by an administrative agency will be upheld if they are in harmony with the agency's express statutory authority or spring from those powers or may be fairly implied therefrom" (internal quotation marks and citation omitted)). The HWA, pursuant to RCRA, authorizes NMED to administer the State's hazardous waste program. *See* § 74-4-4(A); *Sw. Rsch. & Info. Ctr.*, 2014-NMCA-098, ¶ 9. This authority necessarily includes the responsibility to collect data regarding the amount of hazardous waste the HWA charges NMED with regulating. The PMR enables the NMED to collect more, not less, data by tracking the volume of the innermost waste container *in addition to* the volume of the outermost container. We therefore conclude NMED's order to approve the PMR did not abandon its authority under RCRA or the HWA and is consistent with its responsibility to monitor waste quantity.

## 2. NMED Did Not Erroneously Interpret the LWA

**{17}** Appellants also contend NMED's order misinterprets the LWA. They argue that Pub. L. No. 102-579, § 7(a)(3), 103 Stat. 4777 of the LWA requires measuring the WIPP capacity limit by the volume of the outermost waste container, as evidenced by the legislative intent behind the LWA and in light of other LWA provisions. We disagree.

**{18}** "Whether or not legislative history is ever relevant, it need not be consulted when . . . the statutory text is unambiguous." *United States v. Woods*, 571 U.S. 31, 46 n.5 (2013) (citing *Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012)); *accord Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 23, 147 N.M. 523, 226 P.3d 622 (stating that our Supreme Court interprets a statute and determines its legislative intent when the statute's language is ambiguous but interprets the statute as written when it is clear and unambiguous). "[W]e will not read into a statute . . . language which is not there, particularly if it makes sense as written." *Sw. Org. Project v. Albuquerque-Bernalillo Cnty. Air Quality Control Bd.*, 2021-NMCA-005, ¶ 11, 482 P.3d 1273 (internal quotation marks and citation omitted).

**{19}** We conclude the LWA is unambiguous, and thus interpret it as written. LWA, Pub. L. No. 102-579, § 7(a)(3), 103 Stat. 4777 establishes the total storage capacity for TRU waste by volume: "6.2 million cubic feet of transuranic waste." *Id.* The LWA does not specify a method for measuring TRU waste volume. Neither does the statute's

---

6These RCRA regulations have been adopted as HWA regulations. *See, e.g.*, 20.4.1.200 NMAC (adopting 40 C.F.R. § 261 (1980)); 20.4.1.500 NMAC (adopting 40 C.F.R. § 264 (1980)); 20.4.1.900 NMAC (adopting 40 C.F.R. § 270 (1983)).

definition of "transuranic waste"[7] specify a method for measuring TRU waste volume or include discussion of void space or dunnage materials within the outermost container. *See* Pub. L. No. 102-579, § 2(20), 106 Stat. 4777. Congress certainly could have inserted language in the 1996 amendment to the LWA specifying how TRU waste would be measured or language defining TRU waste in a manner that would require inclusion of void space or dunnage materials within the outermost container. No such language was included, and we decline to read such language into the Act. *See Rio Grande Chapter of the Sierra Club*, 2003-NMSC-005, ¶¶ 24-26 (declining to read language into a statute silent as to a particular issue but instead reading the statute as "simply . . . not address[ing]" that issue and determining that an agency's interpretation of the statute fell within its statutory authority). Nor do Appellants point to another LWA provision that specifies that TRU waste volume must be calculated by measuring the outer container volume.[8] Having determined that the plain language of the statute specifies a waste capacity limit but simply does not address a particular method for calculating that limit, a circumstance quite similar to that our New Mexico Supreme Court encountered in *Rio Grande Chapter of the Sierra Club*, *see id.*, we cannot find ambiguity in language that is simply not in the statute. Because we conclude the statute is unambiguous, and that there is no basis to conclude that the NMED order runs afoul of language contained within the LWA, we need not reach Appellants' arguments regarding the LWA's legislative history or intent regarding waste volume calculation. *See Lion's Gate Water*, 2009-NMSC-057, ¶ 23. Accordingly, we conclude NMED did not erroneously interpret the LWA.

### 3.    NMED's Order Does Not Create a Conflict Between RCRA and the LWA

**{20}**    Appellants argue NMED is "obligated to avoid finding a statutory conflict" between RCRA and the LWA and instead "must strive to give effect to both statutes." To the extent a conflict does exist between RCRA and the LWA, Appellants contend RCRA would prevail. Having determined that neither RCRA nor the LWA specifies a method for measuring waste emplacement volume at WIPP, we conclude the PMR does not conflict with either statute. Instead, the PMR provides for two distinct methods for calculating waste, which correspond to two distinct purposes: (1) tracking innermost container volumes, which relates to the LWA's 6.2 million cubic feet TRU waste capacity limit; and (2) tracking outermost container volumes, which relates to the physical capacity of individual HWDUs. The PMR thus continues to track the outermost container volume, but incorporates additional data tracking the innermost container volume.

**{21}**    Appellants argue "DOE's proposed interpretation would change a longstanding and controlling interpretation without any explanation, contrary to law." Appellants contend that "[n]either DOE nor NMED has offered a reasoned explanation for changing

---

7Defining "transuranic waste" as "waste containing more than 100 nanocuries of alpha-emitting transuranic isotopes per gram of waste, with half-lives greater than [twenty] years," subject to several exceptions, not relevant here. Pub. L. No. 102-579, § 2(20), 106 Stat. 4777, as amended by Pub. L. No. 104-201, § 3182 (1992 and 1996).

8We note that several statutory provisions Appellants cite in support of their argument come from the preamended version of the LWA.

the interpretation of the LWA limit," [9] and the "facts have not changed since the 1980's, when DOE relied on container volume." [10] We disagree.

**{22}** Although DOE has historically measured and reported waste volume based on the volume of the outermost container, as we previously noted, the permitting process allows for permit modifications over time to address changed circumstances. *See* § 74-4-4.2(D) (authorizing NMED to modify permits); § 74-4-4.2(G)(2) (stating that a "permit may be modified at the request of the permittee for just cause as demonstrated by the permittee"). DOE and NMED offered a reasoned explanation for the PMR. The Hearing Officer found that "DOE has explained in the PMR that the assumptions upon which the original method of measuring waste emplaced in WIPP have[,] with experience[,] proven to be wrong and without the changes embodied in the PMR the DOE will not be able to complete the purpose for which WIPP was authorized by Congress." Because the original permit incorrectly assumed that the containers would be full of TRU mixed waste, the assumption created "a de facto limit that could result in underutilizing the WIPP facility[,]" contrary to the LWA, which established the limit of 6.2 million cubic feet of waste to be emplaced at the facility. Given that the PMR is intended to ensure that the actual volume of material is tracked, as well as the volume of the storage containers to be emplaced, so that as the department explained, it could more easily ensure that it complies with the volume limitation in LWA, we conclude that the PMR is supported by a reasoned explanation.

**{23}** To the extent Appellants argue the PMR violates the LWA because it allows DOE to use "any method of calculation it chooses," resulting in "*no limit* at all" for TRU waste, Appellants' assertion is contrary to the record. The Hearing Officer found that DOE "clearly articulated the method that [will be] utilized to determine the volume of waste in containers emplaced in WIPP." DOE uses a tracking program containing complete information on the types of inner and outer containers being shipped to WIPP, allowing DOE to track individual container volumes based on container type. DOE will thus track the LWA capacity limitation based on inner containers with a known geometry.

**{24}** Finally, Appellants argue that the Hearing Officer failed to consider "the multiple savings clauses that maintain the State's authority to apply RCRA." Appellants fail to develop this argument and provide no analysis regarding the way in which the language of the savings clauses should have factored into the hearing officer's recommendations. Even so, we find nothing in the LWA's savings clauses that address or specify the manner in which the waste volume should be measured. And we certainly do not find anything within the savings clauses to indicate that the permitting decision at issue is wrong. The NMED's order approving the PMR is consistent with the LWA's limitation on

---

9Appellants also argue that the State and its citizens have relied on the WIPP volume limit. This argument is not adequately developed and we therefore decline to address it. *See Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

10Appellants further contend that the State and its citizens have relied on the WIPP volume limit. Again, this argument is not adequately developed and we decline to address it. *Id.*

the total waste capacity, which cannot be complied with unless there is an accurate method for measurement of that waste.

## 4. DOE's Authority

**{25}** Appellants claim DOE lacks the authority to interpret or enforce the terms of the LWA. NMED's order adopted the findings of the Hearing Officer, who determined that the question of DOE's independent authority under the LWA to interpret the volume limitation was inapplicable because the statutory language in the LWA is unambiguous. The Hearing Officer reasoned that, because the statutory language is unambiguous, "DOE is . . . not interpreting the volume limitation in LWA but simply relying on what is unambiguously stated." The Hearing Officer further noted that because various federal statutes "grant DOE the responsibility and authority to manage certain radioactive materials[,] including radioactive waste, . . . [these statutes] would appear to grant DOE authority to make decisions related to carrying out its responsibility of disposing of the defense TRU waste[,]" despite the lack of explicit language granting DOE authority to "interpret[] the volume limitation in [the] LWA." In so finding, the Hearing Officer relied on *United States v. Turkette*, 452 U.S. 576, 580 (1981), which held that "[i]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." (internal quotation marks and citation omitted).

**{26}** We agree with the Hearing Officer's reasoning. The language of the LWA simply states that the volume limit for TRU waste at WIPP is 6.2 million cubic feet, which is the limit on waste material that DOE is required to manage. Because DOE is merely carrying out its statutory responsibility to manage TRU waste, and because the language of the LWA setting the limit on such waste is unambiguous, we conclude that DOE is not exercising an independent authority to interpret the LWA.

## 5. The Consultation and Cooperation Agreement

**{27}** Appellants contend NMED's order violates WIPP capacity limits in the 1987 Consultation and Cooperation Agreement (C&C Agreement). They argue that the 1987 C&C Agreement's reference to DOE's 1981 WIPP Record of Decision, "which came from the 1980 FEIS and is based on container volume[,]" requires DOE to continue to calculate TRU waste by outermost container volume.

**{28}** The WIPP authorization act provides that DOE shall consult with New Mexico officials in regard to the WIPP project and seek to enter into an agreement with New Mexico officials. Pub L. 96-164, § 213(b), 93 Stat. 1259 (1979). The DOE and New Mexico entered into such an agreement in 1981, which has twice been modified. However, the most recent version, the 1987 C&C agreement, contains no requirement or discussion of the proper method for measurement. The 1987 C&C Agreement states:

> Prior to receiving more than 15 percent by volume of the [TRU] waste capacity of [WIPP], described as 6.2 million cubic feet of [TRU]

waste in [DOE's 1981 WIPP] Record of Decision, . . . the Secretary of Energy shall demonstrate that the [WIPP] meets the applicable environmental standards for the disposal of radioactive waste[.]

We fail to see how this language establishes a capacity limit for WIPP based on the outermost container volume. If the State and DOE had wanted modifications to the C&C Agreement limiting the volume of waste at WIPP by outer container volume, the parties to the agreement would have included such a provision.

**{29}** Moreover, Appellants acknowledge "[t]he C&C Agreement is independent of the [WIPP] Permit." With that admission, we fail to understand how the C&C Agreement is relevant to the permitting issues raised in this appeal and Appellants do not further explain why we should consider the C& C Agreement at all, so we will not consider this argument further.

**{30}** In sum, we cannot say NMED's order to approve the PMR was "based on an error of law, . . . arbitrary and unreasonable, . . . based on conjecture, . . . [or] inconsistent with established facts." *Perkins*, 1987-NMCA-148, ¶ 22. Accordingly, we conclude NMED's order was in accordance with the law.

## B. NMED's Order Was Not Arbitrary and Capricious or an Abuse of Discretion

**{31}** Appellants argue NMED's order was arbitrary and capricious and an abuse of discretion in light of the Hearing Officer's and NMED's failure to consider evidence regarding safety issues at WIPP. We disagree.

**{32}** The Hearing Officer considered relevant safety testimony and heard testimony indicating the PMR would not impact safety. The Hearing Officer's unchallenged finding stated that safety testimony presented by Appellants' witness was of critical importance but noted that it was not developed enough to affect his recommendation to approve the PMR. Moreover, in adopting the Hearing Officer's findings of fact, conclusions of law, and recommended disposition, NMED "considered the administrative record in its entirety," which included testimony from a witness opposing the PMR acknowledging that the proposed modification would not impact human health or the environment.

**{33}** The Hearing Officer also considered Appellants' argument that the PMR "request[ed] a major expansion" of WIPP, and found that the PMR did not seek an expansion of WIPP disposal capacity. The Hearing Officer also found that any attempt to expand the footprint of WIPP by utilizing additional HWDUs would require permittees to submit another PMR. Our own review of the record similarly indicates that the PMR only adds additional tracking data and does not expand the WIPP TRU waste capacity limit. We cannot say NMED refused to consider evidence regarding safety issues at WIPP, or that NMED's order was without a rational basis or contrary to logic and reason, or that evidence did not support NMED's finding. Accordingly, we conclude NMED's order was not arbitrary and capricious or an abuse of discretion.

**CONCLUSION**

**{34}** For the above reasons, we affirm.

**{35} IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**SHAMMARA H. HENDERSON, Judge**

## APPENDIX



EXHIBIT D
LARGER CONTAINERS USED TO OVERPACK 55-GALLON DRUMS



55-Gallon Drum

S100 Pipe Overpack
Container (POC)

55-Gallon Drum Volume: 0.21 m³

S100 Inner Container Volume: 0.00163 m³ (~1% of 55-Gallon Drum Volume)

EXHIBIT E
PIPE OVERPACK COMPONENT PLACED IN A 55-GALLON DRUM