This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-40546**

**INDEPENDENT PETROLEUM ASSOCIATION OF NEW MEXICO,**

Appellant,

v.

**NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD, Appellee,**

and

**CLEAN AIR ADVOCATES, ENVIRONMENTAL DEFENSE FUND, CENTER FOR CIVIC POLICY, NAEVA f/k/a NAVA EDUCATION PROJECT, NATURAL RESOURCES DEFENSE COUNCIL, and NEW MEXICO ENVIRONMENT DEPARTMENT,**

Intervenors-Appellees,

**IN THE MATTER OF PROPOSED NEW REGULATION 20.2.50 NMAC OIL AND GAS SECTOR-OZONE PRECURSOR POLLUTANTS.**

**APPEAL FROM THE NEW MEXICO ENVIRONMENTAL IMPROVEMENT BOARD
Pamela Jones, Administrative Hearing Officer**

Montgomery & Andrews, P.A.
Louis W. Rose
Kari E. Olson
Seth C. McMillan
Santa Fe, NM

Mountain States Legal Foundation
Ivan London, Pro Hac Vice
Lakewood, CO

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM

Emily Bowen, Assistant Attorney General
Albuquerque, NM

for Appellees

Western Environmental Law Center
Tannis Fox
Santa Fe, NM

deLone Law, Inc.
Elizabeth Paranhos
Boulder, CO

Baake Law, LLC
David R. Baake
Las Cruces, NM

University of New Mexico Law School
Natural Resources and Environmental Law Clinic
Gabriel Pacyniak
Michelle Reitz, Clinical Law Student
Andy Lantz, Clinical Law Student

for Intervenors-Appellees Clean Air Advocates, Environmental Defense Fund, Center
for Civic Policy, Naeva f/k/a NAVA Education Project, and Natural Resources Defense
Council

Andrew P. Knight, Assistant General Counsel
Albuquerque, NM

for Intervenor-Appellee New Mexico Environment Department

Eric Ames
Durango, CO

for Amicus Curiae Center for Methane Emissions Solutions

**MEMORANDUM OPINION**

**BOGARDUS, Judge.**

**{1}**     Independent Petroleum Association of New Mexico (Appellant) appeals the Environmental Improvement Board's (the Board) final order adopting 20.2.50 NMAC (Part 50), which regulates the emission of ozone precursors pursuant to NMSA 1978, Section 74-2-5(C) (2021). On appeal, Appellant argues that certain sections of the new regulation should be stricken from Part 50 because those provisions are contrary to law. Specifically, Appellant argues that: (1) the Board exceeded its statutory authority by regulating Chaves County and Rio Arriba County under the new rule; (2) the Board's inclusion of the gross annual revenue prong of the small business facility definition in 20.2.50.7(S)(1) NMAC was arbitrary; (3) the Board exceeded its authority in adopting 20.2.50.125(G) NMAC; (4) the proximity monitoring requirements included in 20.2.50.116(C)(3)(C) NMAC are outside the scope of the noticed rulemaking proceeding; and (5) the Board's adoption of Part 50 was unlawful because the Board failed to consider the impacts of the proposed rule. We affirm.

**BACKGROUND**

**{2}**     This appeal involves the Board's adoption of a new rule—Part 50—that regulates ozone emissions in New Mexico. The objective of Part 50 "is to establish emission standards for volatile organic compounds . . . and oxides of nitrogen . . . (ozone precursors) for oil and gas production, processing, compression, and transmission sources." 20.2.50.6 NMAC. The rule is the product of two environmental initiatives in New Mexico: the New Mexico Environmental Department's (NMED) "Ozone Attainment Initiative," which strives to make certain that New Mexico "maintain[s] compliance with the National Ambient Air Quality Standards (national standards) for ozone," and Executive Order 2019-003 that directed New Mexico agencies to "develop a statewide, enforceable regulatory framework to secure reductions in oil and gas sector methane emissions and to prevent waste from new and existing sources." The Board's goal in adopting Part 50 is to ensure New Mexico reduces human-caused ozone precursor emissions.

**{3}**     The federal Clean Air Act (Clean Air Act), requires the Environmental Protection Agency (EPA) to set national standards to combat ozone and other air pollutants. *See* 42 U.S.C. § 7409; 42 U.S.C. § 7408. Each state must implement its own measures to meet the EPA's standards. *See* U.S.C. § 7410(a)(1); 40 C.F.R. §§ 50.9, 50.10, 50.11, 50.15, 50.19. New Mexico enacted the Air Quality Control Act (AQCA) to ensure it complied with the Clean Air Act and met national standards for ozone and other air pollutants. *See* § 74-2-5.

**{4}**     New Mexico is divided into eight Air Quality Control Regions (AQCRs) to monitor ozone and other pollutant levels so that New Mexico meets national standards. *See* 42 U.S.C. § 7410(a)(1); 40 C.F.R pt. 81(B). NMED operates ozone monitoring stations in each of the AQCRs and submits the collected data to the EPA, which then determines whether a specific AQCR complies with its standards. 42 U.S.C §§ 7407(b), (d). Section 74-2-5(C) of the AQCA requires the Board to "adopt a plan, including rules, to control

emissions of [ozone precursors] . . . [when] ozone concentrations exceed ninety-five percent of the primary [national standards]" in order to meet EPA standards.

**{5}** In 2021, pursuant to Section 74-2-5, NMED filed its Petition for Regulatory Change asking the Board to adopt Part 50. The Board published notice of rulemaking and attached NMED's proposed version of the rule. A hearing was held on the proposed rule, the hearing officer submitted a report to the Board, and the Board adopted the final rule. Appellant appeals.

## DISCUSSION

**{6}** On appeal, Appellant asks us to strike certain provisions of Part 50 from the final rule. Appellant first asserts that Chaves County and Rio Arriba County should be removed from the regulation because the Board exceeded its authority under Section 74-2-5(C) when it included these counties in those regulated by the new rule. Next, Appellant argues that we should strike the gross annual revenue prong of Part 50's definition of a small business facility from subsection 20.2.50.7(S)(1) NMAC because it is arbitrary and unpredictable. Appellant then contends we should strike subsection 20.2.50.125(G) NMAC from the final regulation because it grants NMED enforcement authority to revoke the small business facility exemption from an otherwise qualified small business, thereby exceeding the Board's authority. Appellant also argues that the proximity monitoring requirements included in subsection 20.2.50.116(C)(3)(c) NMAC should be stricken because they fall outside the scope of the noticed hearing. Finally, Appellant claims that Part 50 should be set aside because the Board's failure to consider the impact of the proposed rule on ozone concentrations is contrary to law. Before discussing the statutory and regulatory framework, we begin with applicable standards of review and then address each of Appellant's arguments in turn.

## I.      Standard of Review

**{7}** This Court reviews administrative actions taken by the Board, including the adoption and promulgation of regulations, in accordance with NMSA 1978, Section 74-2-9 (1992). Pursuant to the statute, we will only set aside such actions if they are found to be either "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74-2-9(C). It is the burden of the party challenging the rule's adoption to demonstrate that the agency's action fell within one of these grounds for reversal. *See Fitzhugh v. New Mexico Dep't of Lab., Emp. Sec. Div.*, 1996-NMSC-044, ¶ 25, 122 N.M. 173, 922 P.2d 555.

**{8}** An action taken "by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *WildEarth Guardians v. New Mexico Env't Improvement Bd.*, 2024-NMCA-021, ¶ 11, 542 P.3d 820 (internal quotation marks and citation omitted). And an action is not supported by substantial evidence if, looking at both the favorable and unfavorable evidence in the record, there is insufficient evidence that a reasonable mind would

regard as adequate to support the agency's conclusion. *See Fitzhugh*, 1996-NMSC-044, ¶¶ 23-24. Moreover, an agency's action is not in accordance with the law when it "is based on an error of law, is arbitrary and unreasonable, or is based on conjecture, and is inconsistent with established facts." *Nuclear Waste P'ship, LLC v. Nuclear Watch New Mexico*, 2022-NMCA-014, ¶ 12, 505 P.3d 886 (internal quotation marks and citation omitted).

**{9}** As far as our analysis requires us to engage in statutory interpretation, our review is de novo. *See Tucson Elec. Power Co. v. Tax'n & Revenue Dep't*, 2020-NMCA-011, ¶ 6, 456 P.3d 1085 ("[T]he interpretation of statutes presents a question of law that we review de novo."). In reviewing statutes, we seek "to give effect to the intent of the Legislature, look[] to the plain language of the statute, and constru[e] the entire statutory scheme as a whole." *WildEarth Guardians*, 2024-NMCA-021, ¶ 12. "When an agency that is governed by a particular statute construes or applies that statute, th[is C]ourt will begin by according some deference to the agency's interpretation." *Morningstar Water Users Ass'n v. New Mexico Pub. Util. Comm'n*, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 904 P.2d 28. Although we "confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function," *id.* (internal quotation marks and citation omitted), we are "not bound by the agency's interpretation and may substitute [our] own independent judgment for that of the agency because it is the function of the courts to interpret the law," *WildEarth Guardians*, 2024-NMCA-021, ¶ 12 (internal quotation marks and citation omitted).

## II. Chaves and Rio Arriba Counties

**{10}** Appellant argues that the Board's inclusion of Chaves and Rio Arriba counties in Part 50 is contrary to law because "it violates the plain language of Section 74-2-5(C), [which] expressly limit[s] the Board's rulemaking authority to . . . sources of emissions within the area of the state where ozone concentrations exceed ninety-five percent of the primary national ambient air quality standard." Section 74-2-5(C). Moreover, Appellant argues that the Board's identification of areas within the scope of Part 50 on a county-by-county basis was arbitrary and capricious. NMED responds that the Board's inclusion of both counties complied with Section 74-2-5(C) because the counties are located "within the area of the state" where ozone concentrations exceed ninety-five percent. We agree with NMED.

**{11}** The AQCA requires the Board to prevent or abate air pollution. *See* § 74-2-5(A). To do so, the Board is directed to "adopt, promulgate, publish, amend and repeal rules and standards consistent with the [AQCA] to attain and maintain [national standards]." Section 74-2-5(B)(1). This mandate includes the Board's obligation to maintain ozone concentrations below ninety-five percent of national ozone standards pursuant to the Clean Air Act. *See* § 74-2-5(C). The Board is required to "adopt a plan, including rules, to control emissions of oxides of nitrogen and volatile organic compounds (ozone precursors), to provide for attainment and maintenance of the standard." *Id.* The

question before us is whether the sources of air pollution in Chaves and Rio Arriba are within the area of the state.

{12}     "Within the area of the state" may be commonly understood to mean "inside a specific location." Within, as used here, means "inside." *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/within (last visited November 20, 2024). Area is defined as "a particular extent of space or surface or one serving a special function: such as . . . a geographic region." *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/area (last visited November 20, 2024). Accordingly, we understand "within the area of the state" to mean inside a specific geographic region in New Mexico. Our reading of the Clean Air Act is consistent with this plain language interpretation. The Clean Air Act requires states to adopt a plan to meet and maintain national standards of ozone measured by AQCRs. Accordingly, "area of the state" as referred to in Section 74-2-5(C), is the AQCR, because it is also referred to in the Clean Air Act. The two are synonymous.

{13}     We begin by looking at Chaves County. Chaves County is contained entirely in AQCR 155, *see* 40 C.F.R. § 81.242; 40 C.F.R. § 81, App. A, which was shown to exceed 95% of the ozone primary national standards. Any sources of emission in Chaves County are necessarily inside AQCR 155 and thus are "within the area of the state" where the ozone concentrations exceed 95% of the standards. The Board, therefore, rightly exercised its authority to regulate emission sources within Chaves County.

{14}     Turning to Rio Arriba County, we note that it is split into two AQCRs containing both San Juan County and the portion of Rio Arriba County west of the continental divide. *See* 40 C.F.R. § 81.121; 40 C.F.R. § 81, App. A. Monitors in AQCR 014 show that it exceeds 95% of the ozone primary national standards. As a result, sources within AQCR 014 are clearly in the area of the state subject to regulation under Section 74-2-5.

{15}     While the eastern half of Rio Arriba County is in AQCR 17—an area where Ozone levels are under the 95% threshold—we cannot say that the Board's inclusion of the entirety of Rio Arriba County was either arbitrary or capricious. *See Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (stating a decision "is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record."). The Board included all of Rio Arriba County in Part 50 to streamline compliance with the rule because counties have well-established and commonly understood boundaries. In doing so, it reasoned that it would be more difficult for owners and operators of affected sources to determine the applicability of the rule if it were based on AQCR regions rather than counties. Because AQCRs located in both counties were shown to exceed 95% of the national standards, we find no error.

## III.     Gross Annual Revenue Prong

**{16}**     Appellant argues that the gross annual revenue prong of Part 50's definition of a small business facility is arbitrary because revenue has no connection to the actual size of the business, because gross annual revenue is based on fluctuations in the market. Appellant contends that because this factor is based on market uncertainty rather than the size of the business, the factor "creates ambiguity in the application of the regulation." We disagree.

**{17}**     An action taken "by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *WildEarth Guardians*, 2024-NMCA-021, ¶ 11 (internal quotation marks and citation omitted). "Normally an agency rule would be arbitrary or capricious if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Rio Grande Chapter of Sierra Club v. New Mexico Mining Comm'n*, 2003-NMSC-005, ¶ 12, 133 N.M. 97, 61 P.3d 806.

**{18}**     Part 50 defines a small business facility as "a source that is independently owned or operated by a company that is a not a subsidiary or a division of another business, that employs no more than 10 employees at any time during the calendar year, and that has a gross annual revenue of less than $250,000." 20.2.50.7(S)(1) NMAC. The Board found that the purpose of the definition was to "provide regulatory relief to small independent operators by requiring compliance with only a limited subset of requirements in Part 50." The Board further explained that, by including a gross annual revenue prong to the small business facility definition, Part 50 balanced the cost of compliance with the regulation against a company's ability to finance the cost of compliance that may create the risk of insolvency for the majority of the regulated businesses. As a result, these businesses could abandon wells without performing any remediation at all. The Board acknowledged that "gross annual revenues are not a measure of a company's profitability," but nevertheless explained that "sales and revenues are commonly used metrics to evaluate the impact that regulatory burdens may place on small, affected entities." Finally, the Board was not convinced by Appellant's argument that the revenue threshold should be removed from the definition of small business facilities because the use of a "revenue threshold" could cause an operator to qualify and then fail to qualify as a small business depending on its annual revenue. The Board acknowledged that economic fluctuations are inevitable, but ultimately reasoned that such measures are "standard practice . . . when estimating compliance costs and small business impacts [of a regulation]."

**{19}**     The Board's reasoning is consistent with the evidence before it. NMED presented evidence that "[t]he annual average cost of compliance [with Part 50] for the representative facility was $37,945." NMED then provided data showing that only 54 companies reporting a revenue of $250,000 had a calculated revenue per well less than the cost of compliance. Further, NMED's data established that the average cost of compliance for a small business facility was $4,385 per well, and very few companies have a revenue per well less than that. Based on this data, NMED determined that the

$250,000 gross annual revenue threshold balanced "the need to require robust emission reduction requirements for a majority of wells and facilities [with the need] to tailor the requirements for companies with low annual revenue [] and reduce the potential early abandonment of wells." Given the record before us and the reasoning provided by the Board, we cannot say the Board's inclusion of the gross annual revenue prong is either arbitrary or capricious.

## IV. Subsection 20.2.50.125(G) NMAC

**{20}** Appellant next argues that the Board exceeded its authority by enacting subsection 20.2.50.125(G) NMAC because it grants NMED enforcement authority to strip an otherwise qualified facility of its small business exemption. Appellees reply that this subsection is not an enforcement provision, but instead lists three additional factors that NMED considers to determine whether an applicant qualifies for the relief provided by the small business facility exemption. We agree with Appellees.

**{21}** We start with the plain language of 20.2.50.125(G). *See Tucson Elec. Power Co. v. Tax'n & Revenue Dep't*, 2020-NMCA-011, ¶ 6, 456 P.3d 1085 ("[T]he interpretation of statutes presents a question of law that we review de novo.").

**{22}** Section 74-2-12(A)(1), (2) grants NMED the power to enforce "a regulation promulgated pursuant to [the AQCA]" by: "(1) issu[ing] a compliance order . . . or assessing a civil penalty . . . or both; or (2) commenc[ing] a civil action in district court." These enforcement powers are not altered or added to by 20.2.50.125(G) NMAC. Rather, this subsection states that, if NMED finds that a source otherwise meeting the definition of a small business facility under 20.2.50.7(S)(1) NMAC "(1) presents an imminent and substantial endangerment to the public health or welfare or to the environment; (2) is not being operated or maintained in a manner that minimizes emissions of air contaminants; or (3) has violated any other requirement of 20.2.50.125 NMAC," that source may also be required to comply with additional requirements. 20.2.50.125(G) NMAC. As such, we determine that this section does not give the Board additional enforcement power. Instead, it establishes factors to apply for the exemption, consistent with the Board's rulemaking authority. We conclude, then, that the Board did not exceed its enforcement power by considering these factors.

## V. Proximity Monitoring Requirements

**{23}** Appellant contends that we should strike the proximity monitoring requirements included in 20.2.50.116(C)(3)(e) NMAC because they are beyond the scope of noticed rulemaking, violating the public's right to notice and comment. Specifically, Appellant asserts that the adopted requirements have an impact on pollutants and sources of emission beyond those described in the notice and failed to notify those interested in participating. Appellees respond that Appellant lacks standing to challenge the adoption of the requirements because it was not adversely affected by the lack of notice and the requirements are within the scope of the noticed rulemaking because the proposed rule included comprehensive monitoring requirements and the shared purpose of reducing

the emissions of ozone precursors. We conclude that although Appellant has standing to challenge the proximity monitoring requirements, these requirements are within the scope of the notice.

## A.     Standing

**{24}**    The Board argues Appellant lacks standing because it was not adversely affected, because it had actual notice of the proposed requirement and an opportunity to respond. We believe that Appellees' focus on whether the lack of notice adversely affected Appellant is too narrow under the circumstances.

**{25}**     "Whether a party has standing to litigate a particular issue is a question of law, which we review de novo." *Nass-Romero v. Visa U.S.A. Inc.*, 2012-NMCA-058, ¶ 6, 279 P.3d 772 (internal quotation marks and citation omitted). In determining whether a party has standing under a statute, "we must look to the Legislature's intent as expressed in the act or other relevant authority." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 11, 121 N.M. 764, 918 P.2d 350 (alterations, internal quotation marks, and citation omitted) and "[t]he plain language of a statute is the primary indicator of this intent." *Talbridge Corp. v. New Mexico Tax'n & Revenue Dep't*, 2024-NMCA-044, 550 P.3d 901 (alterations, internal quotation marks, and citation omitted).

**{26}**    Section 74-2-9(A) states that "[a]ny person adversely affected by an administrative action taken by [the Board] . . . may appeal to the court of appeals." It does not limit the right to the specific piece of an administrative action that can be shown to adversely affect a party. Instead, the statute allows an appeal from any part of an administrative action taken by the Board if the action as a whole adversely affects the party. Concluding otherwise would require us to read language into the statute that is not there. *See Reule Sun Corp. v. Valles*, 2010-NMSC-004, ¶ 15, 147 N.M. 512, 226 P.3d 611 ("We will not read into a statute language which is not there, especially when it makes sense as it is written." (internal quotation marks and citation omitted)).

**{27}**    Here, the question is whether Appellant is adversely affected by the requirements adopted by the Board. *See New Mexico Cattle Growers' Ass'n v. New Mexico Water Quality Control Comm'n*, 2013-NMCA-046, ¶¶ 8, 10-13 299 P.3d 436 (holding that the Cattle Grower's Association could not establish standing to appeal the adoption of the regulation because it could not show it was adversely affected by the regulation as a whole). It is not contested that Appellant was adversely affected by the adoption of 20.2.50.116(C)(3)(c) NMAC generally. As a result, Appellant has standing to appeal the regulation adopted by the Board.

## B.     Notice[1]

---

[1]Appellant and Appellees argue over whether the proximity monitoring requirements are within the scope of the notice provided by relying on the logical outgrowth test, used by some federal courts. New Mexico has not yet adopted this test and we decline the invitation to do so.

**{28}**    Having determined that Appellant has standing to challenge the scope of the notice provided by the Board, we address Appellant's assertion that we should strike 20.2.50.116(C)(3)(e) NMAC from the final regulation because the provision falls outside the scope of the notice provided by the Board. We disagree.

**{29}**    Section 74-2-6(C) of the AQCA requires that the Board provide notice no less than thirty days before the date of the hearing. The notice must "state the subject [of the hearing], the time and the place of the hearing . . . the manner in which interested persons may present their views . . . [and] where interested persons may secure copies of any proposed regulation." *Id.* The Board has adopted an additional regulation that adds to these requirements. *See* 20.1.1.301(B) NMAC (listing additional requirements for notice). Despite these requirements, neither the AQCA nor the Board's regulations provide clarity. And we found no indication that these requirements have been defined. Nevertheless, the New Mexico Administrative Code provides an answer in the default procedural rules for rule making.

**{30}**    1.24.25.14(C) NMAC explains that an "agency may adopt, amend or reject [a] proposed rule" and clarifies that "[a]ny amendments to the proposed rule must fall within the scope of the current rulemaking proceeding [and that a]mendments that exceed the scope of the noticed rulemaking may require a new rulemaking proceeding." *Id.* Finally, it clarifies that a final rule may fall outside the scope of the noticed rulemaking if:

> (1) any person affected by the adoption of the rule, if amended, could not have reasonably expected that the change from the published proposed rule would affect the person's interest; (2) subject matter of the amended rule or the issues determined by that rule are different from those in the published proposed rule; or (3) effect of the adopted rule differs from the effect of the published proposed rule.

*Id.* Applying these factors, we conclude that the final rule adopting the proximity monitoring requirements are within the scope of the noticed rulemaking.[2]

**{31}**    The Board's notice stated that the purpose of the proposed Part 50 was to "reduce emissions of ozone precursor pollutants . . . from sources in the oil and gas sector located in areas of the State within the Board's jurisdiction that are experiencing elevated ozone levels." Attached to the notice was a link to NMED's proposed rule. It contained monitoring requirements for defect and leak identification at well sites under section 20.2.50.116. The disputed change to the proposed rule adopted in the final version of Part 50 added an additional quarterly monitoring requirement for emission sources within 1000 feet of an occupied area, *see* 20.2.50.116(C)(3)(e) NMAC, and

---

[2]Appellees argue that 1.24.25.14(C) NMAC does not apply because the Board has adopted its own procedural rules consistent with the State Rules Act, NMSA 1978, Sections 14-4-1 to -11 (1967, as amended through 2017) and the default procedural rules for rule making only apply when "[s]tate agencies . . . have not adopted their own procedural rules consistent with the State Rules Act." 1.24.25.2 NMAC. Although the Board has adopted its own procedural rules, none of them address the scope of notice required. There is no procedural rule governing the scope of notice that is consistent with the State Rules Act. And so, we defer to the default procedural rules as stated in 1.24.25 NMAC.

included a definition of "occupied area." *See* 20.2.50.7(O)(1). We fail to see how the change from the proposed rule to the final rule fell outside the scope of the noticed rule making.

**{32}**    It is likely that persons affected by the proposed final rule could have reasonably expected that the change would affect their interests. This is because the added proximity requirement does not change the emission sources regulated or the way they are regulated. Instead, the change only increases the frequency with which certain sources already subject to defect and leak monitoring are required to be monitored. Consequently, those affected by added proximity monitoring requirements could have reasonably expected that their interests could be affected. Further, the change does not alter the issues affected by the rule—the same emission sources are subject to the same monitoring. Only monitoring frequency is changed. Finally, the effect of the final rule does not differ from the proposed rule. Both the proposed and final version monitor emission sources to identify leaking components and reduce leaking emissions. Therefore, we conclude that adoption of 20.2.50.116(C)(3)(e) NMAC and the accompanying definition of "occupied area" did not exceed the scope of the Board's noticed rulemaking or the attached proposed rule.[3]

## VI.    The Board's Adoption of Part 50 was Not Arbitrary and Capricious

**{33}**    Appellant's final argument is that the Board's adoption of Part 50 was arbitrary and capricious and must be set aside because the Board failed to assess whether it would reduce ozone concentrations. Appellant claims that the Board could not assess whether the final rule would lead to a reduction in ozone because it relied on flawed data that did not distinguish between two types of ozone precursors and was not updated to account for the changes in the proposed rule. Appellees respond that the Board's reliance on the modeling data provided was reasonable and supported by substantial evidence. We agree with Appellees.

**{34}**    Based on the record before us, we cannot say that the Board's adoption of Part 50 had no rational connection to the facts before it nor can we say that it entirely omits consideration of relevant factors in ozone emission reduction. The Board concluded that Part 50 would lead to a reduction of ozone precursors so that the state would meet ozone levels that complied with the national standards. In reaching its conclusion, the Board acknowledged Appellant's concerns, addressed the testimony supporting those concerns, recited testimony that rebutted those concerns, and explained its rationale for

---

3Appellant argues the scope of the noticed rulemaking was exceeded because it regulated emissions beyond the stated purpose of the proposed rule, regulated emission sources beyond the Board's authority, and was adopted for the benefits of reducing emission of other harmful pollutants beyond the stated purpose of the rule.

The purpose for adopting the proximity monitoring provision was the same as the purpose of the proposed rule: to reduce the emission of ozone precursors. Furthermore, the requirement applies to sources of emission within the counties subject to Part 50, *see* 20.2.50.2 NMAC and does not regulate sources beyond the Board's statutory authority. Finally, the Board is required to consider co-benefits when adopting new regulations. *See* § 74-2-5(F) (listing the co-benefits that the Board must consider when making its rules). We reject Appellant's contentions here.

relying on NMED's modeling. Other than summarily stating that the Board needed to update the modeling it relied on to account for the changes in the proposed rule, Appellant does not develop an argument supporting its contention that the Board's conclusions were not supported by substantial evidence. *See State v. Aragon*, 1999-NMCA-060, ¶ 10, 127 N.M. 393, 981 P.2d 1211 ("[I]t is [Appellant's] burden on appeal to demonstrate any claimed error below."); *State v. Ortiz*, 2009-NMCA-092, ¶ 32, 146 N.M. 873, 215 P.3d 811 (stating that "[a] party cannot throw out legal theories without connecting them to any elements and any factual support for the elements" (internal quotation marks and citation omitted)).

**CONCLUSION**

**{35}** For the foregoing reasons, we affirm.

**{36}  IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JANE B. YOHALEM, Judge**

**GERALD E. BACA, Judge**